·Price J. Weakley, Appellant, v. John Melvin Weakley, Elmer Weakley, and Mamie Weakley, and American National Bank of St. Joseph, a Corporation, and Frank W. Smith, Trustee.— No. 39473.—198 S. W. (2d) 699.

Division Two, January 13, 1947.

*Alan F. Wherritt, Earl C. Borchers* and *John P. Randolph* for appellant.

*W. T. Harrison* and *R. H. Musser* for respondents John Melvin Weakley and Elmer Weakley.

*Groves & Watkins, O. W. Watkins* and *O. W. Watkins, Jr.,* for respondent American National Bank.

LEEDY, J.—Action to set aside a general warranty deed to approximately 260 acres of land in Clinton County. Other relief was prayed, but the case has been briefed as though involving that one question, and it will be so treated. The chancellor denied cancellation, and plaintiff appealed.

William C. Weakley and his wife, Rose, were the grantors in the challenged deed, which bears date of May 27, 1931, was signed and acknowledged the same day, and filed for record July 13, 1931. The consideration is recited as "assumption of deed of trust [for $10,-500.00] and Five Thousand Dollars . . . and the assumption of a debt of $2650 due by Willard C. Weakley to Rose Weakley." Reserving an estate for life in Willard C., the deed conveyed the fee to his sons, defendants John Melvin Weakley and Elmer Weakley, who are half-brothers of plaintiff, Price. The father, Willard C., was thrice married, each of which marriages having terminated through death. John Melvin and Elmer are children of the first marriage; Price is a child of the second marriage; no children were born of the third. The controversy is really between plaintiff, Price, and his half-brothers, defendants John Melvin (sometimes hereinafter referred to as Mel or J. M.) and Elmer, it being agreed that the interests of the other parties-defendant are merely nominal.

The petition alleges as grounds for setting aside the deed: (1) That defendants, John Melvin and Elmer "with the intent to cheat and

884

defraud this plaintiff . . . fraudulently and unlawfully caused the said Willard C. Weakley to make execute and deliver" the deed in question, and that the same was "'procured by an over-powering of the mind and intention and the purpose of said Willard C. Weakley;" (2) That said defendants "well and truly knew the said Willard C. Weakley was mentally incompetent to transact any business or to understand the effects thereof, or to know and understand what he was doing at the time . . . and was wholly and totally unable to understand and comprehend either the legal or the actual effect of . . . the execution of the deed;" (3) "That the execution and delivery of said deed was wholly and totally without consideration."

The answer of John Melvin and Elmer averred that the consideration recited in the deed had been paid by them, and that it was greatly in excess of the value of the land; that their father had made advancements to, and had paid off and discharged debts in large amounts owing by, Price, and by reason of which he had, on May 27, 1931, become insolvent, and that he agreed with these defendants to convey to them his lands in consideration of their assuming and discharging his indebtedness, and that he called to his home his attorney, D. H. Frost of Plattsburg, whom he directed to prepare the deed in question, which was executed and delivered by their father. In addition to what amounted to a denial of their father's want of mental capacity to make the deed, other matters were pleaded, but as they are not relevant to the present inquiry, they will not be stated.

Willard C. Weakley was a farmer, as are Price and Mel. The land in question constituted the home place, a single farm, located southeast of, and relatively close to the town of Gower. Elmer, who is engaged in business at Plattsburg, left the farm at an early age. Mel, a bachelor about 60 years of age, never left the farm. Price lived on the home place (except for an absence of four or five years in Ohio in the early 20's) until after the death of his father. It appears that a business venture under the name of "Weakley Motor Company", engaged in by Willard C. and Price Weakley at Gower, resulted in somewhat heavy financial losses to the former during the one year of its operation in 1920. There is considerable testimony in the record concerning this subject, but it bears only indirectly upon the issues for determination. Willard C., (sometimes hereinafter referred to as "grantor") owned part of the land in question when he started farming as a young man, and later acquired the rest of it, so that he had owned, lived upon and farmed the premises practically all his adult life. At the time the deed was made he was 72 years of age, and was living in the town of Gower. He died some two years and eight months later on January 13, 1934, at State Hospital No. 2 in St. Joseph, to which institution he had been committed by court order of November 6, 1933. The hospital records show the cause of his death as "Broncho-pneumonia, cerebral arteriosclerosis." In the meantime, it appears grantor was taken

to Research Hospital in Kansas City, for observation and treatment. The records of that institution show he was admitted July 11, 1932, and on July 14, 1932, "discharged into care of relatives as demented."

On the issue of mental capacity it abundantly appears that there had been some impairment in the grantor's mental faculties, culminating in the formal adjudication of incompetency about sixty days prior to his death. The evidence on this issue did not preponderate overwhelmingly in favor of either party. There were but two medical witnesses in the case, one on each side—an expert for plaintiff, and the family physician for defendants. Several of the lay witnesses called by plaintiff detailed acts and conduct indicating unsoundness of mind on the part of grantor. The sharp contest was in relation to the dates of the latter, i. e., whether before or after May 27, 1931, the date of the deed. Grantor contracted pneumonia in the late winter or early spring of 1931, and was quite ill. He was then living in Gower. He was attended by two physicians and a trained nurse, and later by practical nurses, or male attendants. His fever ran as high as 105 degrees, and for a time he became irrational, and difficult to keep confined to his bed.

It is not disputed that there were a few instances when the grantor became confused as to his whereabouts or events, even to the point of straying off or becoming lost. One of these involved these facts: One night while Price and Mel were moving sheep to the farm, their father who had retired, got out of bed, put on his overalls, and without shoes or socks, disappeared. Some neighbors and relatives were summoned, and he was found three-quarters of a mile away on the place from which the sheep were being moved. Price and his wife fixed the date of this incident as the last week in August, 1929. Of the neighbors just referred to (Mr. and Mrs. Graves), only the wife testified. She recalled the incident, but was unable to fix the date. She thought it was before the siege of pneumonia (1931), but was not sure, and on cross-examination declined to say whether it was in '27, '28, '29, '30, '31, '32 or '33. Elmer very positively fixed this date as in 1933, and Mel was sure it was not earlier than 1932. Another time he wandered off, and was found by Mr. Schuster, who fixed the date as late in 1933.

Price put the noticeability of grantor's impaired mental condition at an earlier time than any other witness, to-wit, January, 1927, at which time he testified his father started calling him "Charlie" (the name of his father's brother who had died three years previously), and started calling Mel "John" (the name of another of his father's brothers who was still living.) But he further testified that, at that time, his father was "becoming forgetful . . . getting his mules hitched up wrong," but some days he would be all right; that he always worked. "Even though he was up in years, I'll have to admit he could do more work as an old man than either me or Mel either one. He had his own team, and he planted corn with us, he plowed corn and put up hay, all kinds of farm work that goes on a farm, but he began to get forgetful,

. . . Once in a while, I would say in '27, '28 and '29 he might call me Price, but two out of three times it would be Charlie."

The testimony of Price and his wife was substantially the same with reference to unusual conduct on grantor's part. From their testimony it would further appear that after grantor had pneumonia in 1931 he did not call Price by his right name, but ever afterwards called him "Charlie", and also called Price's wife "Buena" (the name of Price's mother.) Both testified that in assisting at peach canning time, he would become confused, and put the seeds in with the peeled peaches; that he would crawl on the floor under the table and look for his wife, and "pick through the bed covers" looking for a baby; and that he would become confused, and plow corn in the wrong way. The testimony of Elmer and Mel concerning the mental condition of their father prior to 1932 was directly to the contrary. As these four witnesses are directly interested in the result, and the testimony of one may be regarded as offsetting the other, we deem it unnecessary to go into further details.

The supposedly disinterested lay witness on this issue testified for plaintiff, in summary, as follows:

B. A. Atchison lived in Gower and was well acquainted with Willard Weakley. He testified that "sometime late in '30 or early winter of '31," grantor came to his house and handed him a bucket of milk, calling him "Mr. Jones." Grantor did not recognize the witness, who explained that he was at the wrong place, and directed him to the Jones house which was about two blocks away, and across the street from the Weakley residence. He further testified that in 1930 grantor visited a Mr. Poague who was ill at the home of John R. Weakley, and on those occasions "he would stay until the middle of the night and then go to milk, or he would in the daytime go to milk in the middle of the afternoon." Based on these observations, this witness concluded grantor was of unsound mind.

In 1930, L. E. Fouts, a barber lived in Gower, just across the street from grantor. He testified grantor came to the Fouts home on two occasions in 1930, and asked if he could tell where he (Weakley) lived.

Mrs. Graves, the neighbor hereinabove referred to, testified that "about '28, or '9 or '30 . . . he was down at our house, and he was talking about farming, but he was taking the wrong season of the year. When it was time to gather corn he was talking about planting it."

Mrs. Sallie Hawkins undertook to testify concerning a conversation she had with grantor about some eggs, but, on objection, this was stricken. The rest of her testimony related to observing grantor at the time he was ill of pneumonia when, by reason of his high fever, it is conceded, he was irrational.

Mr. Moore had not formed any impression of grantor's mental condition in '29, '30 or '31; but he did know that in 1933 grantor ran off or was lost.

Mrs. Beulah Hickson, the telephone operator at Gower knew about grantor getting lost, but had no recollection as to when it was.

Luther Chaney of Gower, the Recorder of Deeds, was called by plaintiff as a witnes on a matter of formal proof, but on cross-examination he testified he recalled that grantor ran off and became lost, and fixed the time as in the fall of 1933, just as did Schuster (whose deposition was taken by plaintiff). He first observed a change in grantor's mental condition in 1932, and up until August, 1932, he regarded him as sane.

Dr. Carmichael, Superintendent of State Hospital No. 2, testifying as an expert, was of the opinion, upon the basis of the facts assumed in the hypothetical question propounded and from the records of the hospital, that grantor was, on May 27, 1931, incompetent.

Dr. Stark, grantor's family physician for a good many years, and who attended him when he had pneumonia as well as in his last illness, testified that in his opinion on May 27, 1931, grantor was capable of attending to his own affairs, knew the extent of his business, and was sane. Several lay witnesses who were well acquainted with grantor saw nothing abnormal or unusual in his conduct until long after the date of the deed.

In the very recent case of In re Nelson's Estate, 185 S. W. 2d 890, 895, it was said: "But, to invalidate an act or a deed of a person, it is not sufficient to merely show that he or she suffers from senile dementia, or is possessed of a mental weakness. One must go further, and show that the person does not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged. 32 C. J. 726; 28 Am. Jur. p. 701, par. 66; Pennington v. Stanton, 125 Mo. 658, 28 S. W. 1067; Cutler ▆ v. Zollinger, 117 Mo. 92, 22 S. W. 895; State ex rel. Stone v. Grand Lodge, 78 Mo. App. 546; Richardson v. Smart, 65 Mo. App. 14." And so it is in the case at bar. On conflicting evidence—much of it highly unsatisfactory—the chancellor, who saw and heard the witnesses, found the issue of want of mental capacity in favor of defendants. Because grantor may have been forgetful, became confused, or even lost at times, we would not be justified in saying, on the meager evidence before us, that on May 27, 1931, he did not know and understand the nature and effect of the deed.

▆ There is even less substance to the claim of undue influence, an issue upon which plaintiff says defendants had the burden because it appeared that a fiduciary relation existed between grantor and the grantees. Even if this be true, we think the burden was discharged.

Following the collapse of the Weakley Motor Company, which venture was primarily for the benefit of Price, his father was in an unfavorable financial situation, and he turned to his sons, Elmer and Mel, for assistance. The evidence justifies the following findings: There was a mortgage on the farm for $12,000.00 due June 7, 1926, and

Willard owed Gower Bank a note for $4,000.00. The $12,000.00 mortgage was renewed in 1926, and increased to $14,000.00, and it matured again in 1931. Saying that Price had ruined him, he asked Elmer to take up the $4,000.00 note at the bank, and that he would deed the farm to Elmer and Mel, if they would do so. Elmer paid off the $4,000.00 note in 1926, and had the same assigned to him. The mortgage was about to mature in May, 1931, and at the request of Willard, Elmer and Mel went to St. Joseph to see about renewing it, the father saying that "he was going to make us [Mel and Elmer] a deed whenever he got around to it." In the meantime (May, 1927) Mel had applied $2,200.00 in cash to the reduction of the mortgage. As a condition to renewal, the holders required an additional payment of $1,050.00. Willard was so informed, and he requested Mel to call D. H. Frost, the attorney, so that the deed to the farm could be prepared. Mr. Frost went to the Weakley home at Gower with Elmer. There were present Willard and Rose Weakley, Mel, Elmer, Mr. Frost and his small daughter. When the question arose as to Mel and Elmer assuming the indebtedness owed by Willard to his wife, they "balked". Finally, however, it was agreed they would assume such indebtedness, which was scaled down from $2,800.00 to $2,650.00, and they were to receive his personal property. Mr. Frost prepared the deed. When it came to evidencing the $2,650.00 debt due Rose, it was found they did not have a blank note, and Willard said "I'll go get one." He walked down to the drug store, procured the blank note, returned, Mr. Frost filled it in, and Elmer and Mel signed it. Both Mel and Elmer were quite certain there was nothing in the conversation or actions on the part of their father that day which was out of the ordinary; that he (Willard) "knew what he wanted to do and told us and that's what Mr. Frost did." Mr. Frost was not a witness, he having died prior to the filing of the suit. The suit was not filed until nine years and nine months after the deed was made.

It is urged that inasmuch as Elmer failed to produce record evidence of the $4,000.00 payment, such as a cancelled check, his oral testimony, and that of the banker corroborating it, should be disregarded. It is argued also that such failure, coupled with the fact that the sum of $4,000.00 coincides with the amount by which the mortgage was increased in 1926, that the payment of the Gower Bank $4,000.00 indebtedness was effected thereby. These are valid considerations, and were doubtless addressed to the trial court in the first instance, but, standing alone, they are insufficient to cause us to disturb the decree.

On the issue of want of consideration, all the evidence was to the effect that the value of the land in May, 1931, was not more than $30.00 per acre, thus making the value of the farm, at the time, $7,-800.00. Casting aside all evidence touching Mel's advancements to

his father, other than the consideration passing in connection with the deed, it will be seen that the $4,000.00 Elmer paid Gower Bank, the $1,050.00 required ▮ for renewal of the mortgage, and paid by Mel, and the assumption of $2,650.00 due Rose (which was subsequently paid), represents the full value of the farm, to say nothing of the assumption of the mortgage indebtedness, or the outstanding life estate which was reserved.

We regard this case as one in which we should defer to the findings of the chancellor, and, accordingly, affirm the judgment. All concur.