232 S.W.2d 507 (1950)
McELROY
v.
LYNCH et al.
No. 41692.
Supreme Court of Missouri, Division No. 1.
September 11, 1950.
*508 O. H. Swearingen, Kansas City, for appellants.
William I. Potter, Kansas City, for respondent.
LOZIER, Commissioner.
This is a suit to set aside two deeds for a six-apartment building at 4224 Harrison St., Kansas City, Mo., and for an accounting for two transactions, brought by Eugene P. Donnelly as the guardian and curator of Luella Lynch, mentally incompetent. Defendants were James Lynch, Luella's husband, his brother, Thomas Lynch, and Martha E. Treadway, executrix of the estate of Frank Farneman, deceased. Plaintiff had judgment cancelling the deeds and against James Lynch for $1845 and $375.76. The judgment also directed Mrs. Treadway to pay into court the monthly payments due upon Farneman's note to James and Luella. James and Thomas Lynch appealed. Mrs. Treadway did not. (While Thomas joined James in answering and in appealing, he did not testify. It is conceded that Thomas was a mere conduit of title. Accordingly, we shall hereinafter refer to James Lynch as defendant.) Perrin D. McElroy succeeded Donnelly as Luella's guardian and in this court was substituted as party plaintiff.
The issues are: fraud in the execution of one deed and mental incapacity and undue influence in the execution of the other; certain rights and liabilities of owners by the entirety; and the propriety of the circuit court's order impounding installment payments made on a note owned by the entirety.
In 1942 James purchased, apparently with his own money, a house at 2409 East Ninth St., Kansas City. Title to this house is not involved. He had the deed made to "James Lynch and Luella Lynch, husband and wife or the survivor thereof." In March, 1945, "James Lynch and Luella Lynch, husband and wife," conveyed the house to Farneman. Farneman signed a note for $3200, payable in installments of $45 on the 15th of each month. This note was payable to "James Lynch and Luella Lynch," and was secured by a deed of trust in which the beneficiaries were "James Lynch and Luella Lynch, husband and wife, or the survivor thereof."
Farneman later contracted to sell the house to Mrs. Anna Ross, consideration to be paid in monthly installments of $45 each. When Farneman died in June, 1945, the balance due on his note was $3053.54 and at trial time was $1691.18. After Mrs. Treadway had been named executrix of his estate, the probate court directed her to collect the $45 payments from Mrs. Ross and use them in making the $45 payments due on the Farneman note. Thereafter, Mrs. Treadway or her attorney made payments to James totaling $1845. Plaintiff had judgment against defendant for this amount.
The record does not show when James and Luella purchased the apartment property, title to which is in issue, but they had owned it long prior to the time of the execution of the deeds here challenged. This apartment building was conveyed to the Lynchs by the entirety. The consideration *509 was $17,000. Some, if not all, of Farneman's down payment on the Ninth St. house was used to make the down payment on the apartment property. James and Luella executed a purchase money mortgage note to the vendor insurance company for $13,600. This note called for monthly payments of $136.94, $96.87 principal and interest, and $40.07 escrow deposit for taxes and insurance. By trial time the note had been reduced to $11,027.25 and there was $271.35 in the escrow deposit.
The $1845 judgment represented payments made upon the Farneman note, a note owned by James and Luella by the entirety. Cullum v. Rice, 236 Mo.App. 1113, 162 S.W.2d 342; Zahner v. Voelker, Mo.App., 11 S.W.2d 63; and Hamrick v. Lasky, Mo.App., 107 S.W.2d 201. See also Missouri cases cited in Annotations, 8 A.L.R. 1017 and 117 A.L.R. 915. This note was secured by a deed of trust covering the Ninth St. house which had been conveyed to them, and which they had conveyed, by the entirety. It is not material if no part of the purchase price for the house was paid by Luella. See Sutorius v. Mayor, 350 Mo. 1235, 170 S.W.2d 387, 171 S.W.2d 69, and Schwind v. O'Halloran, 346 Mo. 486, 142 S.W.2d 55. "The estate by the entirety did not cease to exist upon the sale of the real estate but merely was transferred from the real estate to the proceeds derived therefrom." Schwind v. O'Halloran, supra [346 Mo. 486, 142 S.W.2d 59], citing Frost v. Frost, 200 Mo. 474, 98 S.W. 527, 118 Am.St.Rep. 689, and Hamrick v. Lasky, supra. See also 26 Am.Jur. 702. In Craig v. Bradley, 153 Mo.App. 586, 134 S.W. 1081, a similar note, given under similar circumstances, was held to have been owned by the husband and wife by the entirety. See also Clevidence v. Mercantile Home Bank & Tr. Co., 355 Mo. 904, 199 S.W.2d 1.
In Stewart v. Shelton, 356 Mo. 258, 201 S.W.2d 395, 398, we said that an estate by the entirety was the same as such an estate at common law, and that its essential characteristic was that "each spouse is seized of the whole or entirety and not of a share, moiety or divisible part." And see Schwind v. O'Halloran, supra.
James and Luella did not each own an undivided one-half interest; each owned the whole note. See Davidson v. Eubanks, 354 Mo. 301, 189 S.W.2d 295, 161 A.L.R. 450. Defendant had had possession of this note since its execution. All of the payments made by Mrs. Treadway's attorney, other than those made by mail, were made to defendant personally at such attorney's office except one made to Luella. These payments were proper as they were made to those in possession of the note at the time they were made. Sees. 3032 and 3103, Mo.R.S.1939 and Mo.R.S.A.; and Pierpoint v. Prudential Ins. Co. of America, 350 Mo. 629, 167 S.W.2d 64. After plaintiff was appointed Luella's guardian and curator, Mrs. Treadway's attorney made one payment to him. Such payment was improper as plaintiff did not have possession of the note, and such payment deprived James of the right to apply it on the insurance company note. The payments made by Mrs. Treadway (under the probate court's order to pay to "James Lynch and Luella Lynch") were paid to James properly and not "inadvertently" as suggested by plaintiff. James, as one of the payees, was entitled to receive the payments and Mrs. Treadway's payments to him, a co-obligee, was a legal discharge. Hamrick v. Lasky, supra.
Defendant pleaded that his receipt of the payments on the Farneman note and his application of such payments upon the insurance company note were by agreement with Luella. He so testified and there was no evidence to the contrary. But whether or not there was such an agreement, James in fact used these payments in making payments upon the principal and interest of the purchase money note for the apartment property. Though this property was "owned by the entirety," their note was not "owed by the entirety." Liability of both James and Luella was joint and several and each was obligated to pay the entire amount. Linders v. Linders, 356 Mo. 852, 204 S.W.2d 229. The payments discharged Luella's individual obligation as well as James' obligation or their joint *510 obligation, and were for her benefit as well as his. Linders v. Linders and Schwind v. O'Halloran, supra. And see Annotation, 142 A.L.R. 371.
The effect of the judgment against defendant for this $1845 was: to deprive James of any interest whatever in the Farneman note and to change its ownership from one by the entirety to one by Luella as her separate property; and to require James to reimburse Luella's estate for amounts paid (in discharge of her legal obligations incurred in the transaction which gave her ownership of the apartment property by the entirety) out of the proceeds of a note owned by the entirety. We have concluded that this result should not be approved.
It follows that the trial court's order directing Mrs. Treadway to deposit in court the payments on the Farneman note should also be disapproved. Defendant asserts that, because of the probate court's directions to Mrs. Treadway, the circuit court was without jurisdiction to make this order. However, this is an equity case originating in the circuit court. See In re Bartels' Estate, 238 Mo.App. 715, 187 S.W.2d 348 (where the circuit court's equity jurisdiction was derivative), and cases cited.
The order impounding the payments, though erroneous, was consistent with the principles applied in the cases cited by plaintiff, viz.: That a court of equity may give relief different from that prayed. Abramsky v. Abramsky, 26§ Mo. 117, 168 S.W. 1178, cited by plaintiff, is inapplicable. There the propriety of the husband's management of the entirety property was the sole issue. Plaintiff here did not seek an accounting of defendant's management and the trial judge neither required such accounting nor appointed a receiver. Defendant's handling of the apartment property was not in issue. We sustain defendant's assignment on this point.
An entirely different situation exists as to the $375.76. This judgment against defendant was based upon the showing that he had received this sum as Luella's share of the proceeds of the sale of Kansas land in which she had inherited an interest. On August 28, 1947 (the date of the apartment property deeds hereinafter described), James and Luella executed a deed for Luella's interest in the Kansas land to Thomas Lynch, and on November 17, 1947, Thomas and his wife joined in a deed conveying this land to a bona fide purchaser. The check for Luella's share was made payable to Thomas, who cashed it and turned over the money to James. According to James, he used this money to make a payment on the principal of a loan he had secured upon his life insurance policy in which Luella was beneficiary.
This $375.76 was Luella's individual property. She had acquired her interest in the Kansas land by inheritance. Such interest and its sale proceeds were her separate estate under Kansas law and the proceeds were still her sole personal property when they came into James' hands in this state. Sec. 23-201, Kan.Gen.Stats. 1935; and Sec. 3390, Mo.R.S.1939 and Mo.R.S.A. This money was neither reduced to James' possession nor disposed of for his own use and benefit with her written consent as required by said Sec. 3390. See Herzog v. Ross, Mo.Sup., 213 S.W.2d 921, and cases cited. Luella made no gift of this money. See Kidd v. Kidd, Mo.App., 216 S.W.2d 942. She could hold him as a constructive trustee or as a debtor. Winn v. Riley, 151 Mo. 61, 52 S.W. 27, 74 Am.St.Rep. 517. Accordingly, judgment against defendant for this $375.76 was proper.
The regularity of the probate court proceedings is not here in issue. Nor is this a suit by the county for reimbursement for all or part of county funds expended in Luella's behalf. Sec. 500, Mo.R.S.1939 and Mo.R.S.A. Defendant's financial situation or whether Luella's bills were for necessaries are not material to the issues. However, the evidence as to such matters will be summarized in so far as it relates to the issue of undue influence and to James' explanation of his motives and purposes in having the deeds executed.
At trial time, March 1949, James was 49 years old and Luella 27. They had been married 8 years and had 2 children, both *511 girls, aged 5 and 3. Defendant's job, at a meat packing plant where he had worked for 15 years, paid about $200 a month. Gross income from apartment rentals for the year prior to trial time was $294. Defendant testified that the annual cost of heating the apartments was about $1500, and mentioned the costs of other utilities, of liability insurance and of repairs, but gave neither figures nor estimates. He said that he had been "in the red" in operating the apartments; and that, without using the sums he received on the Farneman note each month, he could not have made the monthly payments on the insurance company note.
James owned stocks worth about $3700, some of which were pledged for $1200 which he still owed. The total annual dividends were less than $25. He owed a $500 loan on his insurance policy. He was paying the orphanage in which he had placed the children $60 monthly and, in addition, he bought their clothes and shoes. He was behind in his payments, $6 per month, to the state hospital to which Luella had been committed. He had paid only about $50 on this account. He was paying about $7 monthly on his life insurance policy.
Defendant's evidence was that Luella had incurred bills at stores without his knowledge or consent; that two of her creditors had threatened to garnishee his wages, and that he had made arrangements to pay, and did pay, these accounts. The record is not clear as to the total of the accounts nor the exact nature of the purchases. One was for a refrigerator and the others, apparently, were for furniture and clothes for Luella and the children. James estimated that the total of all such bills was $1200. In addition, he had paid Luella's bills at the Robinson Clinic ($193.20, but still owed one of the doctors $23) and about $200 to the hospital of the University of Kansas Medical Center. He had paid over $100 costs in connection with the probate proceeding which he had initiated and dismissed. He had refused to pay a $300 loan which Luella had obtained from a finance company and the proceeds of which she expended in some way unknown to him.
On July 30, 1947, defendant went to the office of one of the investigators for the county court, showed her the bills he and Luella owed, told her of the insurance company note and said he could not pay the $50 per month required by state hospitals for private patients. Upon his representations, the investigator agreed to "take her as a county case." On the same day, James filed in the probate court his affidavit that Luella was insane, that her insanity was of less than three years duration, that she had not sufficient estate to support herself at a state hospital for the insane, that she was so deranged as to endanger herself or others and dangerous to the safety of the community by being at large and that she was then being confined or restrained, and that all this could be proved by himself and two physicians whom he named. However, prior to the date set for hearing, the investigator concluded that, because the apartment property "was valued at $17,000, we thought that that was too much money to consider her an indigent patient, so we got Mr. Lynch to sign a dismissal." On the hearing day, August 5, 1947, James, in writing, informed the court that he desired the proceedings dismissed. The same day the court considered this application, "in open court the County Investigator's office consented to dismissal" and the proceedings were dismissed.
According to both James and the investigator, James tried but failed to make the bond necessary to get Luella in a state institution as a private patient. Next, according to the investigator, Luella's "condition became worse and Dr. Hart asked our office to let him refile and asked us to accept her as a county patient because she needed treatment, which we agreed to do," and that when James "came in the second time and signed, his wife didn't have anything and we did take the case and did commit her only because she needed treatment."
On October 9, 1947, James filed in the probate court an affidavit similar to the previous one. On October 14, 1947, Luella was adjudged insane and ordered admitted to State Hospital No. 2, St. Joseph, as a county patient. The next day Luella was *512 transferred and has since been in the latter institution.
Defendant testified that Luella "was a very intelligent woman, a good personality before she became deranged." She was in the Robinson Clinic, a neurological hospital, for two weeks in September, 1946, where she was given insulin shocks. Later she was in Kansas University Hospital for some time where, apparently, she received similar shock treatments. On July 7, 1947, Luella was brought to the Kansas City General Hospital by the police. She was placed in the psychiatric ward. She appears to have been in good physical condition and there was no evidence of organic pathology. The diagnosis of Dr. William W. Hart, the medical director, who made the initial examination of Luella and took the case history, was that she was suffering from schizophrenia (hebephrenic). On July 13, James, in writing, authorized the hospital to treat Luella with shock therapy. She was subsequently examined by Dr. John Aldis whose diagnosis was the same as Dr. Hart's, schizophrenia hebephrenia. Dr. Aldis found that she did not realize that she was ill, that her grasp of information, insight and judgment as to business plans, social arrangements, family responsibilities and ethical standards were poor; and that she was "very delusional at times, combative, no consistency of emotions and thought content."
Luella was examined daily by one of the physicians on the hospital staff. She was given three electric shock treatments each week. The head nurse's record from July 18 to and including July 23 showed that Luella was usually "friendly or co-operative," but "quiet, withdrawn, and spoke only when spoken to and did not mingle with the other patients; that she sat on the floor reading newspapers or magazines; and that she giggled often." She was clean and neat. Her actions were quick, and the few times she spoke, her speech was short and snappy, and she "smiled readily upon approach." On July 19 and 20, Luella complained of labor pains and stated that she was going to have a baby. She was not pregnant.
On July 23, Luella showed "definite improvement" from the shocks. On July 24, she was restless and easily upset. On July 25, the head nurse's notation showed she had had a shock treatment that day and "giggleseuphoric behaviorwithdrawn"; on July 26, "euphoric,seen by Drs. Aldis and Lockwoodseems quite happygiggles frequently even when nothing is said"; on July 27, "talkativeon the move constantly, says she thinks she'll get to go home Sunday"; on July 29, "euphoric and giddy'it is time for me to go home'overactive, talkative"; on July 30, "says she is going through the menopause." The head nurse's records from July 30 to the time Luella left that hospital were not in evidence. However, the hospital records showed that Luella remained in the psychiatric ward and was treated for schizophrenia hebephrenia until she was removed to the state hospital.
On September 8, 1947, Dr. Aldis found that "her mental condition remains the same." On September 28, 1947, Dr. Bills noted that Luella still showed "schizophrenia psychotic manifestations very pronounced, persecuting ideas, very delusional." Commitment to a state hospital was recommended. On October 15, 1947, when Luella was taken from the hospital, it was noted that her condition was the same as when she was admitted.
The deeds for the apartment property were: one, dated August 28, 1947, and recorded September 6, 1947, from James and Luella to Thomas, and another, dated September 2, 1947, and not recorded, from Thomas and his wife to James. Defendant was the only witness who testified as to the execution of the first deed. He stated that prior to the day Luella signed the deed, he had called upon her but once at the hospital. He testified as to August 28: "Well, I didn't visit with her then because I went to the hospital and told the nurse I had some papers for her to sign, and she went and got somebody, some other nurse, and they came in there, and so when I went in I told her I had the deeds to sign, or probably that I had some papers for her to sign. She said `Come in and I will talk about signing the papers. What are they?' and I said, *513 'They are just things I want you to do.' She took the papers and read them over. She took the deeds and read them over and she said, `If it is O.K. with you, it is all right with me.'" There was no further discussion,when defendant "got the papers signed," he "just left."
Defendant claimed that two nurses were present on that occasion, and that he "told them what he was doing, and they stayed there while she signed and read" the deeds. However, he subpoenaed neither of the nurses, did not know their names, "had no idea who they were" and had made no effort to locate them.
The deed bore the certification, dated August 30, of the acknowledgments of both defendant and Luella. The notary did not accompany defendant to the hospital. Defendant testified that his attorney had prepared the deeds, that he (James) took them to the notary whom he had not known previously, and that the notary told him to go out to the hospital and have Luella sign and then come back and sign in the notary's presence.
The deed to Thomas was recorded. The deed from Thomas to James had not been recorded and was not put in evidence. Defendant said "he didn't know why he didn't record that deed." However: "Q. But you handled this one as sort of a safety valve or a precautionary measure; in other words, if your brother took over or endeavored to hold out on this property, after the property was in his name, you could always put this on him as a sort of a guarantee? A. I guess that is part of it."
Defendant frankly testified that his debts, the garnishment threats and fear of losing his job prompted his actions. He said that he "did it to protect the property for himself" and "to protect it and her investment for her and the kids."Obviously, he was acting primarily in his own interest. See Hamrick v. Lasky, supra.
The record which we have summarized is most persuasive that Luella was not of sound mind on August 28, 1947, and, further, that defendant knew she was insane when he "had her sign the deeds." He testified that on his other call at the hospital prior to August 28, he had brought a deed to the Kansas land which Luella's brother-in-law had prepared, and that Luella "did not think it was a good idea" because "she felt she had some rent coming and she never got it." He "knew" that she understood what she was doing when she signed the deeds on August 28, 1947. But he also admitted that he didn't know in July, 1947, whether "she was sane or insane; I really don't know yet." And answering a question as to Dr. Hart's saying, that same month, that Luella was suffering from schizophrenia and was insane, defendant said: "I don't know. That might be all right, but I don't know." He stated that after her treatments at the Robinson Clinic and the Kansas University Hospital (three or four months before she was taken to the Kansas City General Hospital), she "was supposed to be all right," and that "he didn't know whether she was mentally deranged or not." But he also testified that she. "was a very intelligent woman, a good personality, before she became deranged." A more solemn and eloquent admission is his affidavit initiating the first insanity proceeding nearly two months before he "had her sign."
Luella's mother lived at James' and Luella's home between May, 1946, and March, 1948. She testified that Luella's suspicions that James was "having an affair" with a woman occupant of one of the apartments worried Luella, and that James had once told her (his mother-in-law) that he thought that such suspicion was "what finally finished her mind." We have no doubt as to defendant's knowledge of Luella's mental condition when he "had her sign."
Plaintiff had the burden of showing by clear, cogent and convincing evidence that Luella was not of sound mind when she signed the deeds. Key v. Kilburn, Mo.Sup., 228 S.W.2d 731; and McCoy v. McCoy, Mo.Sup., 227 S.W.2d 698. We believe that plaintiff established such fact by such evidence. The only evidence tending to show that Luella might have possessed sufficient understanding of the nature and effect of her action was defendant's own testimony. The trial judge was in a much better position than we are to determine defendant's *514 credibility and the weight to be accorded to his story. Bick v. Mueller, 346 Mo. 746, 142 S.W.2d 1021. James was an interested party and neither the trial judge was, nor this court is, required to accept his version. See 8 A.L.R. 796, 814.
Defendant cites Weakley v. Weakley, 355 Mo. 882, 198 S.W.2d 699, 703. The facts in that case were quite different. There the grantor was admitted to a private hospital for observation 14 months, and committed to a state hospital 18 months, after he had executed the deed; and the testimony, chiefly of lay witnesses, was meager and conflicting, "much of it highly unsatisfactory." Here the evidence is ample and uncontradicted. Defendant also cites cases involving mere eccentricities or peculiarities of grantors or involving conveyances for consideration to grantees who had no knowledge of the grantors' lack of mental capacity.
However, we need not base our conclusion alone upon our belief that Luella did not possess the mental capacity to understand the nature and effect of her action. Defendant urges that "a person of lawful age having mental capacity to understand the nature of a transaction may be the donor of his property and may give it to whom he pleases," citing Walker v. General American Life Ins. Co., Mo.Sup., 141 S.W.2d 785, and Harrelson v. Flournoy, 229 Mo.App. 582, 78 S.W.2d 895. It is true that mental capacity may be co-existent with mental illness. In re Nelson's Estate, Mo.App., 185 S.W.2d 890. See also Weakley v. Weakley, supra. But mental ailment is also an important factor for consideration on the issue of undue influence. Holland v. Anderson, Mo.Sup., 196 S.W.2d 175; and Colquitt v. Lowe, Mo.Sup., 184 S.W.2d 420.
Undue influence is a dominating influence which, by force, coercion or overpersuasion overcomes the will power and substitutes the will of another. Plaintiff had the burden of showing that Luella signed as a result of such influence exerted by James. See McCoy v. McCoy, and Key v. Kilburn, supra; Ulrich v. Zimmerman, 349 Mo. 772, 163 S.W.2d 567; Bockting v. Bockting, Mo.Sup., 217 S.W.2d 538; and Bitzenburg v. Bitzenburg, Mo.Sup., 226 S.W.2d 1017. We think, as did the trial judge, he sustained that burden.
Here was a young wife and mother who had never handled business affairs. She had been in that psychiatric ward 7 weeks and had previously been treated at two other hospitals for mental illness. She was in the advanced stages of a form of dementia praecox, some of the symptoms of which are apathy, indifference to family and friends, delusions, giggling and laughter without cause,all accompanied by an increasing loss of will power and a progressively defective judgment.
We re-examine James' account of what happened on August 28, 1947, and, for the moment, assume the verity of his story, to determine whether the influence he exerted that day was undue. Well knowing his wife's condition, he told her he had some deeds or papers for her to sign. When she asked what they were, he told her nothing except "just things I want you to do." He offered no explanations; he did not remind her of his and her debts; he made no effort to explain the transaction; he gave her no assurance that "it was done to protect the property for her and the kids." She did not ask why they were deeding the property, without consideration, to his brother, and defendant did not tell her that Thomas was going to deed it back to him. If, as defendant says, she read the deed, we doubt if she understood it. If she did, she made no inquiry, but with full confidence in her husband, said: "If it's O.K. with you, it is all right with me." Even after she had signed, defendant did not offer to explain the transaction to her,as he said: "There was no further conversation. When I got the deeds signed I just left."
For another reason, James' influence was undue. In pursuance of a carefully prepared plan, defendant made the agreement with his brother, had his attorney prepare the deeds, had Luella sign one, obtained the notarization of her signature, recorded that deed, secured the deed from Thomas and his wife and withheld it from record. He, and he alone, secured Luella's signature. Such activity in procuring execution of the *515 deeds is likewise a factor for consideration on the issue of undue influence. Holland v. Anderson, supra; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59; Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449; and Horn v. Owens, Mo.Sup., 171 S.W.2d 585.
It is our opinion that, even if Luella had "mental capacity" on August 28, 1947, her husband took advantage of her pathetic mental condition and unduly influenced her to sign away her entirety interest in the apartment property. The trial court's ruling on this issue was proper.
Those portions of the decree cancelling the deeds and rendering judgment against defendant for $375.76 are affirmed; the portions rendering judgment against defendant for $1845 and impounding the payments on the Farneman note are reversed; and the cause is remanded with directions to enter judgment accordingly.
VAN OSDOL and ASCHEMEYER, C.C., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur except HOLLINGSWORTH, J., not voting because not a member of the court when cause was submitted.