**STATE of Missouri, Respondent,**

v.

**Rodney Glen GARRETT, Appellant.**

**No. 50782.**

Supreme Court of Missouri,

Division No. 2.

June 14, 1965.

Norman H. Anderson, Atty. Gen., Jefferson City, David G. Dempsey, Asst. Atty. Gen., Clayton, for respondent.

William J. Shaw, Gene McNary, Clayton, for appellant.

EAGER, Presiding Judge.

Defendant was found guilty by a jury of first degree robbery, committed with a dangerous and deadly weapon. The principal, and we may say only, defense was that defendant was not guilty by reason of "mental disease or defect." Sections 552.010–552.040, RSMo, Laws 1963, p. 674 et seq. V.A.M.S. Defendant's appointed counsel requested and defendant was given a psychiatric examination prior to arraignment; he was also examined subsequently. Fol-

lowing the conviction and a finding by the Court of a prior felony, defendant was sentenced to the Department of Corrections for a term of ninety-nine years. After a detailed motion for new trial was overruled, this appeal was taken. Defendant was and is most ably represented by the Public Defender of St. Louis County.

On the afternoon of April 30, 1963, defendant and a boy named "Kenny" entered the "Jam Inn" restaurant and 3.2 beer place on Highway 66 in St. Louis County. Defendant ordered and drank a beer; the only waitress on duty, Evelyn Jean Brown, had seen him in the place previously, but did not actually know him. A little later he came back alone and parked in front of the place; he ordered and drank another beer and waited until the other one or two customers had gone. As the waitress was washing dishes, he approached her from the rear with an open pocketknife in his hand, grabbed her around the neck with one arm, cut her on the right side of the face and on the throat and, after she fell to the floor, stabbed her in the back at least seven times. When the knife was found later the blade which had been used was bent. In defendant's written and oral confessions, admitted without objection, he stated that he told the girl he wanted the money and not to scream, that she started to kick and scream, and that he got excited and "started striking her." In any event, he then dragged her to the rear of the place, took the paper money from the cash register, tore the telephone receiver from the instrument and laid it on the bar. He then moved the girl, threatening to kill her, into the men's room, where he choked her until she blacked out. Thereupon, he left and drove away. The girl regained consciousness, got up and ran to a motel apartment next door where she lives with her parents. She was bleeding profusely; the police came and she described her assailant before being taken to a hospital. Fifty-one stitches were required to close the cuts in her face and neck, and she remained in the hospital for eight days, during which time a lung collapsed. There

would seem to be no serious residual damage. From the description given, the police very promptly went out and picked up the defendant (whom one or more of them knew) in the process of using the telephone in a bar four or five miles away. One $20 bill and fifteen one dollar bills were found on him—with a red, sticky substance on them. Both in oral statements and in a signed confession taken on the same evening, defendant admitted substantially all the details of the offense.

At the trial, and to some extent here, counsel rely on certain remarks and circumstances which are said to indicate some form of insanity, per se. We mention some of these, but they were matters solely for the jury on the weight of the evidence, and there is and can be no contention that the crime was not sufficiently proven, or that the existence of a "mental disease or defect" was not a question for the jury. Principally, these things are: that the crime was committed in a place where defendant was known and where his father was known; that he made a remark to Miss Brown that he was "used to doing this"; that he inquired of her where the phone was and where the knife was that he had dropped; that he apparently tried to get her outside the place after cutting and stabbing her; that several persons said that he had been drinking but that he did not seem to be intoxicated; that when arrested at the telephone, he said,—"I'm glad you caught me or you'd find her in the river, too"; that three other knives were found in his car; that he told one or more officers that he committed the offense because he needed the money, that he did not know why he had cut the girl, and that he had a sudden impulse to hurt someone. However, we note also that in defendant's signed confession he stated that he started drinking that morning at about 7:30, "mostly whisky at different places," that he committed the offense on "the spur of the moment," and that he then went home, washed, and changed his shirt before going out again, because it was bloody and torn. In an oral state-

ment to police he had said that he waited until two customers left to rob the girl. None of these circumstances or statements can be decisive of the questions we have here.

Dr. Anton F. Heusler, a physician specializing in psychiatry, had examined defendant about three months prior to the trial; he had also read the various depositions showing the circumstances of the offense, and had received and studied the psychological report of a Dr. Ossario who had also examined the defendant. Dr. Ossario had reported that defendant had an oral IQ of 73, a performance IQ of 81, a "full scale" IQ of 75, and that defendant's general capacity was in the "dull normal" range. Dr. Heusler determined that defendant had a personality disorder, meaning that he was a sociopath of the anti-social type and that his mentality was that of a borderline defective. This witness defined a sociopathic personality as one with a deviation which makes it "extremely difficult for him to conform to the social culture in which he lives"; he also stated that when a mental deficiency is added it would be more difficult for the individual to so conform to the social culture or to law. Dr. Heusler testified that, considering everything, defendant had a mental deficiency and that he probably could not conform his conduct to the requirements of the law; that in arriving at this conclusion he considered both the sociopathic personality and the mental deficiency, the latter of which was also in his opinion a mental disorder. On cross-examination he discussed the ordinary characteristics of sociopaths.[1]

In rebuttal the State produced Dr. Paul T. Hartman, a physician also specializing in neurology and psychiatry, who had examined defendant by appointment of the Court. This witness had also read the depositions and had seen Dr. Ossario's report. His stated conclusion was that the defendant had no mental illness or defect which would prevent him from conforming his conduct to the requirement of the law or prevent him from appreciating the nature, quality or wrongfulness of his conduct. He testified that defendant was within the limits of normal intelligence; that he did have a sociopathic personality, meaning that he tended to do what he wanted to do and not to conform, and that he had also an inability to profit from past experiences; that in his opinion this was not a mental disease or defect.

We quote here the pertinent portions of the mental responsibility act, Laws 1963, p. 674 et seq.

Section 552.010. "The terms 'mental disease or defect' include congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct, whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. * * *"

Section 552.030. "1. A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law. * * *

"3. Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible

"(1) To prove that the defendant did or did not have a state of mind which is an element of the offense; or

"(2) For the purpose of determining whether or not the defendant, if found guilty of a capital offense, shall be sentenced to death or life imprisonment. * * *

---

1. The parties here agree that sociopathy alone is included within the *exception* (§ 552.010) described as an "abnormality manifested only by repeated criminal or otherwise anti-social conduct, * * *" although this witness classified the condition as a mental disorder.

"5. All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct, whether or not previously adjudicated in this or any other state to be or to have been insane, drunkards, drug addicts, sexual or social psychopaths, or otherwise mentally ill, incompetent, deranged or impaired. The issue of whether any person had a mental disease or defect excluding responsibility for his conduct is one for the jury to decide upon the introduction of substantial evidence of lack of such responsibility. But in the absence of such evidence the presumption shall be conclusive. Upon the introduction of substantial evidence of lack of such responsibility, the presumption shall not disappear and shall alone be sufficient to take that issue to the jury. The jury shall be instructed as to the existence and nature of such presumption when requested by the state and, where the issue of such responsibility is one for the jury to decide, the jury shall be told that the burden rests upon the accused to show by a preponderance or greater weight of the credible evidence that the defendant was suffering from a mental disease or defect excluding responsibility at the time of the conduct charged against him.

"6. When the defendant is acquitted on the ground of mental disease or defect excluding responsibility, the verdict and the judgment shall so state."

Section 552.040. "1. When a defendant is acquitted on the ground of mental disease or defect excluding responsibility the court shall order such person to be committed to the director of the division of mental diseases for custody, care and treatment in a state mental hospital. No person shall be released from such commitment until it is determined through the procedures provided in this section that he does not have and in the reasonable future is not likely to have a mental disease or defect rendering him dangerous to the safety of himself or others or unable to conform his conduct to the requirements of law."

Instruction No. 2 was a detailed instruction on the defense of mental disease or defect. Thereby the jury was told, in substance, that if it found beyond a reasonable doubt that defendant committed the offense in question but that he, as the result of a mental disease or defect "did not know the nature, quality or wrongfulness of his conduct or he was incapable of conforming his conduct to the requirements of the law," then it should return a verdict of "Not Guilty by Reason of Mental Disease or Defect Excluding Responsibility." In this instruction the jury was told that "mental disease or defect" did not include an abnormality "manifested only by repeated criminal or otherwise anti-social conduct," and also of the presumption of freedom from mental disease or defect expressly provided by § 552.030(5). If we understand the objection now made to the instruction, it is: that the defense of mental disease or defect was based upon a combination of defendant's sociopathic personality (excluded by the statute as a defense, when existing alone) *and* the existence of a borderline intellect, which, together, were said by Dr. Heusler to constitute mental disease or defect rendering defendant probably unable to conform his conduct to the requirements of law; and that the instruction, by referring in several places to *"a"* mental disease or defect, limited the jury's finding to *one* of these and not to the combination which in fact constituted the causative defect. This is a rather hypertechnical point. The statute, § 552.030, uses the term "mental disease or defect" in a generalized sense which, as we understand, merely means a mind sufficiently disordered to cause the results indicated (with the specific exceptions noted). The term was not intended to designate any specific form or forms or medical classifications of mental disease. The complaint made seems to rest solely in an objection to the use of the article *"a"* before the term "mental disease or defect." No ordinarily intelligent jury would construe the term as used so narrowly, but would consider "a mental disease

or defect" as embracing all the symptoms and classifications which might enter into the aggregate mental condition. We so hold. We are further corroborated in this view by the fact that the jury was also told (after noting the exception of "repeated criminal or otherwise anti-social conduct") that the phrase mental disease or defect: "means and includes any mental disease or defect regardless of its medical label or source, whether it was present at birth or developed later as a result of injury or physical or mental disease, or whether it is capable of improving or deteriorating. In determining whether or not the defendant had a mental disease or defect at the time of the offense charged against him, the jury may take into consideration all of the facts, circumstances and opinions of lay and expert witnesses given in evidence." We do not find the instruction misleading or confusing and the claim of error is denied.

■ In another point it is insisted that the Court erred in refusing to give the following instruction "B": "You are further instructed that if you return a verdict of 'Not Guilty by Reason of Mental Disease or Defect Excluding Responsibility' it would then become the duty of this Court to order the defendant committed to the director of the division of mental diseases of this state for custody, care and treatment in a state mental institution. The defendant could be released from such commitment only if and when it was determined that he did not then have and in the reasonable future was not likely to have a mental disease or defect rendering him dangerous to the safety of himself or others or unable to conform his conduct to the requirements of law. The defendant could be released after such a determination only upon order of this Court after notice to the head of the hospital, the director of the division of mental disease, the Prosecuting Attorney of the County of St. Louis, and the defendant, and after a hearing if one were requested." The instruction generally follows § 552.040 providing the procedures to be followed *after* a defendant is acquitted because of

mental incompetency. Counsel say, in substance, that in such event a defendant is automatically committed to a mental institution and that the jury is not fully informed unless it is told that he will not be turned loose on the streets. The cases cited for the proposition are all from the Court of Appeals for the District of Columbia where the Durham rule on "insanity" originated. (Durham v. United States, 99 U.S.App.D.C. 132, 237 F.2d 760.) Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725; McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847; Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398. In Lyles, the leading case of the group, there were several opinions with somewhat confusing results. Apparently six judges held that such an instruction should be given, and three that it should not. There, a brief oral instruction was given which was found not to be entirely correct but not reversibly erroneous. The majority held that while a jury ordinarily has no concern with the consequences of its verdict, a verdict of not guilty by reason of mental disease or defect is not generally understood and that an exception should be made. Three judges disagreed with that view in a vigorous opinion concurring in the result. Therein they called attention to the fact that juries (in federal courts) are never instructed as to the extent of punishment or the possibility of probation; further, it was said: "The issue of insanity, fairly raised, does no more than present another factual question to the jury: whether the defendant was mentally responsible when the criminal act was done. That issue also should be determined on the basis of the evidence only and, in deciding it, the jury should not be influenced by a consideration of the result of an acquittal by reason of insanity; that is an extraneous consideration wholly unconnected with the evidence from which the jury must reach a determination of the factual issue raised concerning the defendant's mental condition."

In the later case, McDonald v. United States, 312 F.2d 847, the Court remained di-

vided on this question. In the earlier case, Taylor v. United States, 222 F.2d 398, in holding that such an instruction should be given the Court noted that while it would have no *"theoretical"* bearing on the jury's verdict, it might have a *"practical bearing."* The same *practical* consideration is noted in an article appearing in Temple Law Quarterly, Vol. 29, p. 247, not cited by counsel, in which the author suggests that a provision requiring such an instruction be included in the Model Penal Code.

Counsel for defendant also rely upon the able and extensive Treatise on our new Mental Responsibility Law appearing in the December 1963 issue of the Missouri Bar Journal (Mr. Orville Richardson, Mr. Daniel P. Reardon, Jr., and Professor Joseph J. Simeone). Noting that confinement is automatic upon a finding of mental irresponsibility, the authors strongly indicate that a jury should be so instructed, and that the State's attorney should not be permitted to argue that "he might be out in a few months." (Loc. cit. 721.) The article contains a suggested instruction, and cites most of the authorities pro and con. This article, generally, is worthy of the close study of those who are in contact with this new and little understood law.

In Pope v. United States (CA5), 298 F.2d 507, a similar instruction was refused. The Court of Appeals concurred. In so ruling the Court noted that the disposition of a defendant was no more a concern of the jury in cases involving insanity than it is in ordinary findings of guilty or not guilty, with reference to the sentence which the Court will impose, or the likelihood of probation or parole. The Court thus said, loc. cit. 508, that: " * * * matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided. In a case of this nature what they were to decide was whether the defendant was guilty or not."

In this connection we might ask if it would be deemed appropriate for a Missouri trial court, in a "Second Offender" case, to tell the jury (passing only upon guilt or innocence) what punishment it would assess if the jury found the defendant guilty? Obviously, the answer is that it would not be proper, for this would very definitely tend to influence the jury wholly outside the evidence, in arriving at its verdict.

In the recent case of State v. Park, 159 Me. 328, 193 A.2d 1, the Court affirmed the refusal of the trial court to give a similar instruction in a murder case, under very similar statutes. The Court said there, 193 A.2d, loc. cit. 5: "It has long been the settled practice in our State that the function of the jury is to find the facts and to apply the law as given by the Court to the facts in reaching their verdict. Punishment, or whatever may transpire after the verdict, is not the concern of the jury.

"No exception to this general rule is found in our cases where the plea has been not guilty by reason of insanity. There was therefore no error on the part of the presiding Justice in refusing to inform the jury of the consequences of a verdict of not guilty by reason of insanity.

"We are not convinced that there is any sound reason for altering our practice by reason of the adoption of the 1961 statute relating to mental responsibility for criminal conduct. We are aware that in cases arising on appeal from the Courts of the District of Columbia under the Durham Rule, so-called, which our 1961 Act closely follows, the point has been otherwise decided. Lyles v. United States, 103 U.S.App. D.C. 22, 254 F.2d 725; Catlin v. United States, 102 U.S.App.D.C. 127, 251 F.2d 368; McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847. The result we reach is found in Pope v. United States, 298 F.2d 507 (C.A. 5th), involving an insanity plea but not the Durham Rule. The respondent takes nothing from the exception." See also State v. White, 60 Wash.2d 551, 374 P.2d 942 (decided under the M'Naghten

rule on insanity but applicable in principle); and, on differing facts but bearing some analogy: State v. Eisenstein, 72 Ariz. 320, 235 P.2d 1011, 1022–1033; Draper v. Denno, D.C.N.Y., 113 F.Supp. 290; State v. Daley, 54 Or. 514, 103 P. 502, 503, and, on rehearing, 54 Or. 514, 104 P. 1. In State v. McGee, 212 Mo. 95, 110 S.W. 699, the jury was instructed that if any defendant under the age of eighteen years was convicted he would be sent to the training school for boys and not to the jail or penitentiary. On appeal the Court said: " * * * this part of the instruction was something with which the jury had nothing whatever to do, * *."

Such an instruction has no legitimate bearing on any fact issue which the jury must decide; it is entirely clear that it might, if given, tend to influence the jury to find the existence of mental irresponsibility by deviating from the strict confines of the evidence on the subject of mental disorder. The weakness of the whole contention is rather clearly shown in the opinion which really started the controversy (Taylor, supra) where the Court said that, although such an instruction would have no *"theoretical* bearing"* on the case, it might have a very *"practical* bearing"*; and, also, in Missouri Bar Journal, December 1963, loc. cit. 733, where the authors state (quoting) that such instruction "may be an enormous influence on the jury's deliberations * *." No doubt it would be, but at the same time it would divert the jury from the real merits of the insanity issue by the introduction of this extraneous consideration, which actually is nothing less than an invitation for the jury to find the defendant mentally irresponsible *because* he would then be confined anyway. Moreover, the legislature went into considerable detail in our act in providing that the jury should be *instructed* on the presumption of freedom from mental disease or defect; it did not suggest the giving of an instruction concerning the defendant's commitment under § 552.040. The case of State v. Johnson, Mo., 267 S.W. 2d 642, 44 A.L.R.2d 973, illustrates the type of controversies which may arise in final arguments and perhaps through converse instructions if this subject is once introduced. We hold that Instruction B was properly refused.

■ Defendant also claims error in the refusal of his Instruction "A" which required the jury to find defendant *not guilty* if, at the time of the offense, he "had a mental disease or defect sufficient to deprive him of ability to act willfully or feloniously * * *." Counsel substantially concede that this instruction was urged with the view of having the jury return a verdict of not guilty without a finding of mental disease, thus freeing the defendant entirely; in other words,—the desire was to have the jury find just enough "insanity" to destroy any felonious intent, but not enough to constitute "mental disease or defect" excluding responsibility which would require such a statement in the verdict and a resulting commitment. Section 552.030(6). This is an attempt to play somewhat "fast and loose" with the statute. One essential purpose of the present statutes, as well as of the former "right from wrong" theory of insanity, is and was to determine whether the defendant did or did not have sufficient mentality to realize *and intend* an unlawful act. Under Instruction No. 2 it was required that defendant be exonerated, "by reason of mental disease or defect excluding responsibility" if as a result thereof *"he did not know the nature, quality or wrongfulness of his conduct * * *."* (Italics ours.) That instruction was certainly sufficient to submit for all legitimate purposes the element of acting "wilfully or feloniously," and no further specific instruction was required or proper. How, may we ask, would a jury ever differentiate between a condition where the defendant could merely entertain no wilful or felonious intent but have no mental disease or disorder sufficient to prevent him from knowing the "nature, quality or wrongfulness of his conduct," and one where by reason of mental disease or defect he could not have this knowledge? And where would the burden of proof lie on such a defense? For a discussion of these

rather intricate distinctions, see Weihofen, Mental Disorder as a Criminal Defense, 1954, loc. cit. 182 et seq.; Yale Law Journal, Vol. 56, p. 959. It is true that § 552.030(3) provides that *evidence* of mental disease or defect shall be admissible to prove that the defendant did or did not have a state of mind which is an element of the offense; such evidence was admitted here, and the "state of mind" was adequately covered in Instruction No. 2. Some of the authors of treatises seem to indicate that intoxication should constitute a sufficient mental disorder to render one incapable of entertaining such mental requirements as deliberation or premeditation, or even a specific intent. Missouri has for generations firmly and specifically rejected that doctrine. State v. Shipman, 354 Mo. 265, 189 S.W.2d 273; State v. Comer, 296 Mo. 1, 247 S.W. 179, 182.

In State v. Holloway, 156 Mo. 222, 56 S.W. 734, a defense of insanity was made in a first degree murder case. The defendant requested an instruction stating that although the defendant might have had sufficient mind to intend the murder, still, if he did not have sufficient mentality to "coolly deliberate" the killing, then he was guilty only of murder in the second degree. The instruction was refused. On appeal the Court said, in part, loc. cit. 737: "No error occurred in this. If sane, defendant was indubitably guilty of murder in the first degree; if insane, of nothing. No halfway house exists, in a case of this sort, between murder in the first and any minor degree of that crime. Defendant, if sane, 'could coolly deliberate said murder'; if insane, he could neither deliberate nor premeditate, and consequently was guiltless of the crime charged, and of any degree of that crime; and defendant's counsel, in their zeal for their client, do not insist that the crime so long delayed was done in hot blood." That opinion has been mentioned several times as listing Missouri among those states refusing to adopt the theory of "Partial Responsibility" advanced in Instruction A in the present case. See also, as generally to the same effect, State v. Barbata, 336 Mo.

362, 80 S.W.2d 865, 868(1, 2); Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382. We adhere to that ruling, and we do not find that the adoption of the present Mental Responsibility Law requires or indicates the necessity of any change. Actually, the giving of an instruction of this type would permit the jury to evade the real intent and purpose of § 552.030 and § 552.-040 by acquitting the defendant completely (without a commitment) on a finding of a lesser degree of "mental disease or defect" than contemplated in the act, although the requirement of a willful and felonious intent had been fully submitted in the general instruction on mental disease. The word "willfully" actually means only intentionally (State v. Foster, 355 Mo. 577, 197 S.W.2d 313, 321), and the word "feloniously," generally used to classify offenses, is not actually a distinct element of a crime. State v. Barton, 142 Mo. 450, 44 S.W. 239, 240. Such an instruction as "A" would merely go to the existence of a general criminal intent which is an element of every crime (Schein v. Gallivan, 321 Mo. 268, 10 S.W.2d 521) and which was fully covered in Instruction No. 2. Under this point counsel suggest the possible unconstitutionality of the new act if, in fact, it provides no method for finding a defendant *not guilty* (without a commitment) who may have recovered from a preexisting mental disease since the time of the crime. We find nothing in the point on its merits, but it will suffice to say that no such question was properly raised or preserved. In fact, we have given the defendant the benefit of every doubt in considering the present point on the merits, in view of the most casual way in which it was raised in the motion for new trial. The refusal of Instruction A was proper.

■ Defendant urges that the procedure under our Second Offender Act, § 556.280, permitting the Court to hear and determine the question of prior felonies, is violative of his right to a jury trial on factual issues under Art. 1, § 18(a), Mo.Const. V.A.M.S. and of the Sixth Amendment to the United States Constitution. No such objection was

made when the evidence was offered out of the presence of the jury. This objection, not having been raised at the earliest opportunity, was waived. State v. Barnes, Mo., 345 S.W.2d 130, 133. That statute has, however, been upheld as against sundry constitutional objections in opinions which definitely preclude the present contention. State v. Williams, Mo., 343 S.W.2d 58; State v. Wolfe, Mo., 343 S.W.2d 10, cert. denied 366 U.S. 953, 81 S.Ct. 1912, 6 L.Ed. 2d 1246, cert. denied 368 U.S. 907, 82 S.Ct. 188, 7 L.Ed.2d 101; State v. Morton, Mo., 338 S.W.2d 858; State v. Griffin, Mo., 339 S.W.2d 803, cert. denied 366 U.S. 938, 81 S.Ct. 1666, 6 L.Ed.2d 849; State v. Brownridge, Mo., 353 S.W.2d 715.

Counsel included in their brief a point to the effect that the document offered to show defendant's imprisonment in Indiana was inadmissible because not properly authenticated. However, in the oral argument counsel stated, with reference to that point: "I don't think our position is well taken," so we pass the point.

Complaint is made that the Court erred in giving Instruction No. 5, to the effect intoxication should not be considered as "constituting any excuse, mitigation or extenuation of the alleged offense," if the jury should find that defendant was intoxicated at the time. The complaints are that the evidence did not justify such an instruction, that it constituted a comment on the evidence, and that it was "grossly prejudicial" to defendant's theory of mental illness. It is true that some of the police officers testified that defendant had been drinking, but that he did not appear to be intoxicated; on the other hand, defendant's confession (to which no objection was made) stated that he "started drinking at about 7:30 a. m. on the 30th of April and continued drinking until this incident occurred at about 4:45 p. m. * * * I drank mostly whiskey at different places * * *." There are various degrees of intoxication, as almost everyone knows, and no degree of intoxication will excuse the commission of a crime; we rule that such an instruction is justified where it may fairly be inferred from the evidence that the defendant was under the influence of liquor to such an extent that his judgment and actions were substantially affected thereby. From defendant's own confession such was a fair inference here, regardless of his appearance to some of the witnesses. And the jury was entitled to consider his actions from this standpoint, as well as from the standpoint of mental disease. The instruction being proper, it is of no consequence that it may have been prejudicial to defendant's theory of "mental illness"; and it was not an improper comment on the evidence. The case of State v. Church, 199 Mo. 605, 98 S.W. 16, is cited. There it appeared that the defendant in a murder prosecution had drunk "a lot of blackberry wine." The instruction there referred to "drunkenness." The defense proffered was insanity. The instruction was held to be erroneous but not prejudicial; the Court there said, loc. cit. 24: "If the defendant was not drunk, how could he be prejudiced by instructing the jury that drunkenness is no excuse for crime, etc.? There is no contention that anything was an excuse for the crime in this case other than the insanity of the defendant, hence we are unable to conceive how he could have been prejudiced by this instruction." If the Court intended in that opinion to hold that no instruction on intoxication should be given unless there is specific evidence, in so many words, that a witness was intoxicated or drunk, then that part of the opinion should no longer be followed. See generally: State v. Pinski, Mo., 163 S.W.2d 785; State v. Woodward, 191 Mo. 617, 90 S.W. 90; State v. Deviney, Mo., 278 S.W. 726. In the latter case the evidence was that defendant had been "drinking some" on the evening of the robbery; an instruction on intoxication was given, although the defendant had offered no such defense. The giving of the instruction was held proper. And see, particularly, State v. Bartley, 337 Mo. 229, 84 S.W.2d 637. There was no error in giving Instruction No. 5 in our case.

Counsel complain at some length concerning the sustaining of objections to several hypothetical questions asked Dr. Heusler, defendant's psychiatrist. They also complain of certain comments made by the court during the course of that questioning. For the purpose of this opinion it will suffice to say that we have examined all of the questions, all of the objections and all of the comments. It would be impracticable to relate and discuss all of them here. Some of the objections which were sustained were probably insufficient, as counsel contend. However, the substance of the evidence sought in all of the questions was subsequently received, and we hold that no prejudice resulted, even if some of the rulings were erroneous. State v. Hacker, Mo., 291 S.W.2d 155; State v. Shipley, Mo., 232 S.W.2d 515, 518. The comments of the trial court were not prejudicial; in fact, the court conducted itself in a very commendable manner throughout the trial. The contention is denied.

The judgment of the trial court is affirmed.

All of the Judges concur.