RICHARD R. HERZOG and VERITA HERZOG, Respondents, v. VIOLET ROSS and JEANNE MCCABE, Appellants.—No. 40710.—213 S. W. (2d) 921.

Court en Banc, September 13, 1948.

Rehearing Denied, October 11, 1948.

*J. E. Patton* for appellants.

*Jesse T. Friday* for respondents.

180

[922] ELLISON, J.—In this suit the trial court decreed specific performance of a contract to convey land in St. Louis, in favor of the plaintiffs-respondents and against the defendants-appellants, Mrs. McCabe, a widow about 57 years old at the time of these events, and her married daughter Mrs. [923] Ross. The land was described as "property known as and numbered 6850 Plateau (together with fixtures); lot 50 x 178, exact description in title to govern." Plateau was an avenue in the city. The contract was in triplicate, an original and two carbon copies. One of these has been brought up. It was dated August 14, 1944, to be closed October 14, and was on a printed form of the Weiss Realty Company of that City, entitled "Receipt For Earnest Money." In each paragraph following the printed matter were printed blank lines filled, in longhand with the subject matter of the particular contract. The scrivener was Reinhold R. Ruengert, a salesman for the Realty Company. The case has been here once before en banc, 196 S. W. (2d) 268.

Appellants make nine contentions, or assignments of error, as follows. (1) The suit was prematurely brought. (2) The court wrongfully struck out part of Paragraph IV of appellants' answer. (3) The evidence shows the respondents were not able at all times to perform the contract on their part. (4) The contract was altered after its execution. (5) One of the appellants, Mrs. McCabe, was mentally incapacitated when the contract was executed. (6) There was a defect of parties defendant, in that the appellants Violet Ross and Jeanne McCabe did not own the land as joint tenants, but as tenants in common, and Mrs. Ross' husband therefore had a marital interest in the land and was not joined as a party defendant, in consequence of which the contract could not be specifically enforced. (7) The Realty Company and its salesman, Ruengert, represented the contracting parties on both sides, without the consent of appellants, and the contract therefore was unenforceable. (8) The appellant Jeanne McCabe was harassed and coerced by the respondent Richard Herzog and the salesman, Ruengert, into executing the contract while she was bedfast and in a psycho-neurotic condition, which rendered it void. (9) The decree was for the wrong party, and unsupported by clear, cogent and convincing evidence.

We shall take up these assignments substantially in order, but first make a statement of respondents' version of the more general facts. The land in dispute was a corner lot having on it an old two story frame dwelling house with three rooms and a bath upstairs and the same downstairs. Early in March, 1944, Mrs. McCabe was living in the downstairs rooms and had a tenant in the upper rooms. Mrs. Ross and her husband then lived in Kansas City. Ruengert, the salesman for the Realty Company, got in touch with Mrs. McCabe while canvassing in the neighborhood. She was willing to sell, and respondent Herzog and his wife inspected the

house and offered to pay $4200, but no sale was made. In May Mrs. McCabe came to the Herzog home with Ruengert, and told Mrs. Herzog that she had been ill, but wanted them to have the house and asked them to wait a while. Negotiations were resumed in June after Mr. and Mrs. Ross had moved from Kansas City and were living with Mrs. McCabe in the rooms formerly occupied by the tenant. On June 20 Mrs. McCabe and Mrs. Ross signed a listing card giving the Realty Company exclusive authority for six months to sell the lot for $4500 on a 5% commission. The Herzogs made an offer of $4300, but this sale fell through.

Mrs. Herzog testified that on or about August 9, a woman who said she was Mrs. McCabe's daughter Mrs. Ross, telephoned her that "they were ready to sell the property. They' would like to sell it to us." Mrs. Ross denied making that telephone call, but said she didn't know whether Mrs. McCabe made it. Two days later Mrs. Herzog, who was expecting the imminent birth of a child, went to Deaconess Hospital. Pursuant to the foregoing telephone conversation Mr. Herzog went twice to the McCabe home on the afternoon and evening of Sunday, August 13. Mrs. Ross testified her mother, Mrs. McCabe, did all the talking on their side. After long discussion he agreed to pay $4250 for the property, $100 earnest money down, which offer Mrs. McCabe and Mrs. Ross accepted. Mrs. Ross conceded her mother said something to the effect that she would notify the salesman Ruengert to come to the [924] McCabe home the next evening, August 14. He did come and there the contract in dispute was written on the kitchen table, with respondent Herzog, appellants McCabe and Mrs. Ross, and Mrs. Ross' husband, present. The latter was not a party to the contract and did not sign it or take part in the transaction. All the parties agree on that.

During the conversation Mr. Herzog said he wanted to be sure the house was free of termites, and a stipulation was written into the contract covering that point. The termite inspection was made by a concern in that business on August 18, and Herzog paid $5 for that as well as the $100 earnest money. The contract was in triplicate, one copy for the buyer, one for the seller, and one for the Realty Company. The three contracting parties present all signed it, but Ruengert retained possession of all the copies until the signature of Mrs. Herzog could be obtained, she being in the hospital. After she was discharged she signed it on August 22, and Mr. Herzog wrote his o. k. and signature under the "termite clause" on the same date. The copies were then delivered to the respective parties.

During the last week in August a woman who said she was Mrs. McCabe telephoned Mrs. Herzog stating they were moving from the house, and inquiring whether the Herzogs would be interested in buying some of her household furnishings. Pursuant to that inquiry Herzog went to the McCabe home and did buy the linoleum on

the kitchen floor, and a rug. Mrs. Ross, appellant, admitted she remembered that incident. Mrs. McCabe and the Rosses moved out of the house on or about September 1 to another house the Rosses had bought. Thereafter Herzog met a neighbor and told him a Gottschalk family who had lived in the new house the Rosses had purchased, were moving from it into the house Herzog was buying from Mrs. McCabe and Mrs. Ross. He telephoned Mrs. Ross on September 25 and asked if she and her mother were not going through with the sale to him and she said they were not, because they could not get as great an interest return on the $4250 he was paying, as they could by keeping and renting the house for $50 per month to the Gottschalks. She further said her mother, Mrs. McCabe, had been in Malcolm Bliss Hospital, a nervous and mental institution; and that they could not give a clear title to the property because her husband, Mr. Ross, had a marital interest in the property. Mrs. Ross admitted she had a telephone conversation with Herzog about that time and on that subject, but couldn't remember the foregoing. As she recalled he was complaining and threatening because her husband would not sign the contract.

Two days later, on September 27, Ruengert, the salesman, told the Herzogs it appeared the sale was off; that Mrs. McCabe and Mrs. Ross would not go through with it; and he tendered back the $100 earnest money and $5 termite inspection fee which Herzog had paid. Ruengert further presented to Mr. and Mrs. Herzog for their signatures a "Stipulation and Release" cancelling the sale contract, but they refused to sign it and accept the refund. Two days later, on September 29, the Herzogs filed the instant specific performance suit.

It developed in the testimony of the salesman Ruengert and his employer, Edward F. Weiss, that counsel for appellants had written the Weiss Realty Company as far back as August 31 requesting a conference with the attorney wherein he stated Mrs. McCabe was in bad health, and asked that the contract be cancelled on refund of the $100 earnest money and $5 termite fee which Herzog had paid, and $100 to the Realty Company in full of their commission, all as set out in the above Stipulation and Release which counsel had prepared, and which Ruengert did not submit to the Herzogs until three weeks later on September 27. It was this Stipulation which the Herzogs refused to sign. It was not a compromise so far as the Herzogs were concerned. They were simply to get back the money they had already paid and release the appellants.

On October 9 Mr. Weiss of the Realty Company wrote Mrs. McCabe a letter stating "you have informed us you do not intend to go through with the contract"—of sale to Herzog, and notifying her that the purchasers were ready, willing and able to [925] close the sale. The letter further told her if she changed her mind to ad-

vise him so he could "have the title run;" and it advised her the Realty Company would expect payment of its commission whether she carried out the contract or not. On October 12 Weiss wrote Mrs. McCabe's attorney that the Herzogs were ready, willing and able to perform the contract; that Mr. Herzog had instructed him to obtain a Certificate of Title; and that the Realty Company's office would be open on the closing date of the contract, to handle the consummation of the sale. Likewise on October 12 Herzog gave Weiss·a check for $50 to pay for having the title examined. On October 14, the closing date, the Herzogs stayed at the Realty Company's office until 3 p. m. to carry out the contract on their part, but the appellants did not appear. Other facts will be stated, as necessary, in the discussion of the assignments of error.

On the first assignment of error—that this suit was prematurely brought. As stated, the suit was filed on September 29, 1944, two weeks before the stipulated time limit for closing the contract, which was October 14.· But the evidence further shows one of the appellants, Mrs. Ross informed Mr. Herzog on or about September 25 before the suit was filed that she and her mother would not carry out the contract. And Mrs. McCabe testified she told the Herzogs (through Ruengert) the next day after the contract was signed that she was too sick and wouldn't be able to go through with it. Appellants' attitude is further shown by their subsequent conduct. The Rosses bought another house, and rented out the house they were selling to the Herzogs. As early as September 5 their counsel had sought a cancellation of the contract through the Realty Company. His theory always has been that the contract was void ab initio. Appellants' answer so pleads, and wholly omits the defense of premature filing. Furthermore, this is not an action at law, but a suit in equity to compel specific performance. Under the facts the foregoing defense is not available to appellants. 1 C. J., p. 1152, Sec. 399; 1 C. J. S., p. 1393, Sec. 127; 58 C. J., p. 1085, Sec. 349; Buder v. Franz (8th Cir.) 27 Fed. (2d) 101, 106; Frank A. Gilbert Realty Co. v. Timmerman (Mo., Div. 2) 183 S. W. (2d) 131, 133.

Assignment 2 is that the chancellor erroneously struck out part of paragraph IV of appellants' answer. The stricken part alleged the contract of sale insufficiently described the lot involved, and failed to disclose with reasonable certainty the terms of the deed of trust provided for therein. These questions were disposed of when the case was here before, 196 S. W. (2d) 268, 270(1-4). Appellants' counsel say that opinion ruled only on the sufficiency of the *petition* with respect to the foregoing alleged defects, but did not pass on the validity of the same objections as *defenses.* There is no merit in that contention. If the foregoing matters were well

pleaded, as the decision held, then proof sustaining those allegations was sufficient.

We state here some further facts concerning the deed of trust. The contract consideration was $4250, of which the Herzogs had paid down $100 earnest money. The balance was made payable as follows: "Seven hundred ($700.00) Dollars Cash, and balance to be secured by a first deed of Trust of $3550.00 with a pay off of $100 at each interest date and a privilege of an extra $100 at each interest date Loan to Run for 3 years owner is to receive all Cash." The interest rate was not specified. Our former opinion held the description of the deed of trust in the contract was ambiguous, but that since the sellers were to receive all cash anyway that made no difference to them.

The evidence showed the Herzogs had available only $800 cash and planned to borrow the remainder of the $4250 total consideration by note secured by deed of trust on the lot, thereby enabling the sellers to get the whole purchase price in money. Mrs. McCabe said she would like to have her brother Van Beers make the loan and Herzog agreed that would be agreeable to him. But that was merely a voluntary oral side agreement, and was not incorporated in the written contract. Mr. Van Beers was out of town at the time and the parties did not know whether he would [926] or could make the loan. Later he signed a unilateral lead pencil memorandum dated August 22, 1944 stating he would loan the money in the name of Louise Wagner. And the Realty Company wrote the notes and deed of trust accordingly, payable at their office. But still later Herzog decided to borrow the money from someone else, though he has never had a chance to do it yet.

We think and hold the basic ruling in our former opinion is controlling here. Where Herzog was to place the loan was purely an oral collateral matter, and not a part of the written real estate contract in suit. So far as the latter is concerned, if the appellants get all the money in cash it will be all they can ask. Indeed, the Herzogs will be getting $100 the worst of it if they make the loan for $3550, as the contract recites. For the difference between the $4250 consideration and the $800 they already had when the contract was written, was only $3450. That part of the contract fails to take into account the $100 earnest money Herzog had already paid down.

Assignment No. 3 is that the respondent Herzogs have not *at all times*, been ready, willing and able to perform their part of the contract. Under this assignment appellants' brief simply iterates the contentions made under the last assignment, that Herzog was unwilling to borrow the $3550 from Mr. Van Beers. What has been said in the last preceding paragraphs disposes of it.

Assignment No. 4 is that the contract was altered after its execution. Further evidence must be stated thereon. After the

third printed paragraph of the sales contract, the following is written in the same hand on the blank printed lines: "(This Contract is subject for the house to be Termite free purchaser to satisfy himself in this respect on September 1st 1944 ————————— O. K. R. R. Herzog.)"

Herzog testified that full paragraph had been written in the contract on the night of August 14, 1944 at Mrs. McCabe's home, before she and Mrs. Ross and he signed at the bottom. He declared the only thing added afterward was his O. K. and adjacent signature, which he inserted after the termite clause, following the termite examination on August 18, which satisfied him on that point. He said he made that insertion on August 22, the date his wife signed the contract. Mrs. Herzog testified Ruengert, the salesman, brought all three contracts to her home the evening she returned from the hospital, August 22, after her baby was born, and that when she signed the contracts they were exactly the same as when presented to her at the trial, saving that her husband wrote in his O. K. and signature below the termite clause before she signed. Ruengert corroborated both of these witnesses on this point.

On the other hand Mrs. Ross testified on direct and cross-examination that when she and her mother, Mrs. McCabe, signed the sales contract no part of the termite clause was in it. But she further stated that after they had signed Mr. Herzog brought up the subject of termites, and they permitted him to have Ruengert write into it, "This contract is subject for the house to be termite free." However she declared the rest of the clause, "purchaser to satisfy himself in this respect by September 1st 1944" was not added at that time, and she first discovered those words had been inserted when her copy of the contract was returned to her by mail after it had been signed by Mrs. Herzog on September 22. The termite inspection was made on August 18, and Mr. Ross testified he complained to Ruengert because of the delay in making it.

Without discussing the law applicable to the alteration of instruments—whether they are material, consented to, and when they may be made[1]—we agree with the evident conclusion of the trial court that Mrs. Ross was mistaken in her version of this incident. The evidence is conflicting and the original carbon copy of the contract brought up does not indicate [927] the challenged words were added later. They appear to be written by the same hand and with the same instrument. The only words that seem to have been written by a different hand are the O. K. and signature R. R. Herzog.

Furthermore, this clause was written into the contract before the execution thereof by Mrs. Herzog, according to her testimony, and

[1]12 C. J., p. 1173, Sec. 2; p. 1223, Sec. 91, p. 1238, Sec. 113; 3 C. J. S., p. 905, Sec. 4; p. 961, Sec. 46; p. 972, Sec. 56; 2 Am. Jur., p. 598, Sec. 6; p. 611, Sec. 19; p. 615, Sec. 25.

delivery of the copies to the signers. Appellants were willing to have the termite inspection made, and their only complaint was that of Mr. Ross (not a party to the contract) because it was not made sooner. And after the contract had been executed and delivered, Mrs. McCabe during the last week of August sold the linoleum on the kitchen floor and a rug to the Herzogs. In addition to that, according to Mrs. Ross' version, the termite clause as first written unconditionally required the house to be termite free. It had no time limit and there was no reason why the Herzogs should have wanted one. Also, the termite inspection was made on August 18 and showed the house clear, before Mrs. Herzog had signed the contract, and the insertion thereafter of a time limit to September 1 would have been useless. We rule this assignment against appellants.

We take up next appellants' assignments 5 and 8. The first of these is that Mrs. McCabe was mentally incapacitated and incompetent to execute the sales contract; and the second is that while she was in a psychoneurotic condition and confined to her bed, respondent Herzog and the salesman, Ruengert, annoyed, harassed and coerced her into affixing her signature, to the sales contract. On these assignments we must review as briefly as possible the medical and lay testimony, which is voluminous. First, as to the annoyance and harassment of Mrs. McCabe.

As will be remembered, the first contacts the salesman Ruengert and the respondent Mr. Herzog had with Mrs. McCabe were in March. At that time, and up to about June 1, Mrs. Ross was not living in St. Louis, but in Kansas City with her husband. In March Mrs. McCabe discussed selling the house and lot involved, and Herzog made an offer of $4200. Mrs. McCabe wrote Mrs. Ross who replied advising against the sale and it was not made. In May Mrs. McCabe called at Herzog's home with Ruengert and talked about a future sale. In June Herzog made another offer, of $4300, after Mrs. Ross and her husband were living in St. Louis, and both had listed the property for sale at $4500. Mrs. Ross said she signed the listing card "under pressure" from Ruengert. That sale also fell through because they had no place to which they could move.

On or about August 9 the Herzogs received a telephone call stating Mrs. Ross and Mrs. McCabe were willing to sell the property. Mrs. Ross denied making that call, but said she didn't know whether Mrs. McCabe made it, if any. Mr. Herzog went to the McCabe home Sunday night, August 13, and had a long conference with Mrs. Ross, at which Ross was in and out but did not participate. The outcome was that Herzog offered $4250. Mrs. McCabe was present during part of that time and then went upstairs to go to bed. When he made his final offer of $4250, she called down from upstairs and said she would sell at that price, and Mrs. Ross agreed.

Mrs. Ross testified Mrs. McCabe did the talking with Herzog on that occasion, and admitted her mother said something to the effect that they would call Ruengert to come the next evening to write the contract. In a deposition Mrs. McCabe denied calling him. She said she couldn't remember anything about the transaction or how, when or where it occurred, except that it was at night. She said she signed the contract without reading it.

The foregoing is a detailed history of the transaction, but Mrs. Ross testified that Herzog called at their home on an average of once a week between June and August while she was there. At the trial Mrs. McCabe testified that beginning in the spring late March or April, it was a continuous thing, Herzog would come to see her one day and Ruengert the next, throughout that whole summer. She said Ruengert told her he used to be a chiropractor and offered to treat her. Mr. Herzog said he went to see Mrs. McCabe only seven times during the six months [928] between March and August, both inclusive. We agree with the necessary conclusion of the chancellor that coercion of appellants was disproven by the weight of this testimony, and therefore overrule their assignment No. 8.

■ As to Mrs. McCabe's mental condition. Respondents agreed she was nervous and frequently changed her mind. She also complained of her health. But they and Ruengert saw nothing wrong with her mind, or her ability to bargain to her own advantage. Mr. Van Beers, an elderly man and a brother of Mrs. McCabe testified she was very nervous in May; walked around in circles; changed the subject of conversation; her voice trembled; got in the wrong side of the automobile when the other door was open; wanted to jump in the river; thought she was going to die; talked about killing herself. He took her to Deaconess Hospital on May 28, and brought her home June 6. She was in that hospital when appellant, Mrs. Ross, arrived in St. Louis about June 1. On the latter's visits there she said Mrs. McCabe would get in and out of bed repeatedly, and complained of her stomach, legs and head. Mr. Ross testified she would hold her abdomen, said her head hurt her, and walked around the house. A neighbor, Cooney, said she complained of pains in her body, and changed the subject of conversation. Mrs. Gottschalk, whose home the Rosses had bought, and who moved into the McCabe house, was the most extreme witness. She testified Mrs. McCabe said she was losing her mind, and that she had a funny look in her eyes—a glare. This witness also averred that Herzog asked her if Mrs. McCabe was crazy, and she answered that she was "mentally ill."

Early in July Mrs. McCabe took an overdose of sleeping pills, closed the kitchen windows and turned on the gas stove burners without lighting them. She was found lying on the floor hysterical and with a scalp wound on the back of her head. On July 8 she

was taken to Malcolm Bliss Hospital, a city mental institution, where she remained until August 6. Her recorded case history there, reported to the institution by Mrs. Ross, as we understand, characterized the gas stove incident as an attempted suicide, and stated Mrs. McCabe had been nervous for 20 years and never in an institution before. Her "mental status" was shown as "oriented to time, place and person", "judgment poor", despondent attitude about health, but thought she would be able to work again. The diagnosis of junior members of the hospital staff, recorded as an "Impression", was "Hypochondiosis", and "Observation" was suggested.

Five days later the head of the institution, Dr. Hans B. Molholm saw Mrs. McCabe. He found her "clear and oriented" but depressed, which she attributed to being in the institution, and inability to sleep because of the noise. She said her difficulties were due to financial problems and overwork. The Doctor thought she had been an insecure, anxious person, which made her more vulnerable to worry. He agreed with the previous diagnosis of psychoneurosis, but disagreed as to the degree. He said it was "a state of mind" not a "disease". Three days before her discharge he noted a marked improvement in her general condition; thought she was ready to leave; and "felt she was now cheerful and optimistic and wanted to go home and take up her life where she had left off, and I felt, and she still insisted or attributed all her difficulty to overwork and concern about financial matters." In this connection it should be stated that Mrs. McCabe's brother, Mr. Van Beers, testified that when she returned from Malcolm Bliss Hospital on August 6 she said she was feeling much better. Mr. Ross said she ceased her aimless walking and would eat her food. This was about a week before the sale contract was signed. The neighbor Cooney said she was worse—still dizzy and reeling around.

Dr. E. L. Brand of Webster Groves testified Mrs. McCabe consulted him professionally at his office six times between August 7 and 25, and on through until November. She was extremely nervous and complained of "imaginary pains and ills", naming a number of those heretofore detailed. She lacked continuity in her conversation and did not follow orders completely—due to lack of understanding and memory, in his opinion. He thought she was psychoneurotic, [929] and did not believe that in "her personal condition at that time she could fully understand what she was doing." That condition, he said, continued on up and through October. But appellant Mrs. Ross testified that when she and her husband moved to their new home in St. Louis on September 1, Mrs. McCabe visited three weeks in Texas, and also in Cuba, Missouri, returning to their home sometime in October. And thereafter through the winter she visited for short periods with her sister-in-law and other friends.

Under the Civil Code, Sec. 114(d), Laws Mo. 1943, p. 388, Sec. 847.114(d) Mo., R. S. A., it is our duty to weigh the foregoing conflicting evidence. But the Section further provides we shall give "due regard" to "the opportunity of the trial court to judge of the credibility of the witnesses." That provision undoubtedly authorizes us also to concede something to the chancellor's better opportunity to appraise the mentality of the witnesses from seeing them and hearing them testify, and observing their demeanor in the court room. Futhermore, great weight should be accorded to the testimony of Dr. Mulholm because he was an experienced specialist in the mental ailment from which it is contended Mrs. McCabe suffered. We think on the whole record, as fortified by the chancellor's conclusions and the result reached in other similar cases, that appellants' Assignment 5 should be overruled. Weakley v. Weakley, 355 Mo. 882, 198 S. W. (2d) 699; Fountain v. Fountain (Mo., Div. 2) 190 S. W. (2d) 941; Burgdorf v. Keever, 351 Mo. 1003, 174 S. W. (2d) 816; Masterson v. Sheahan, 186 S. W. 524, 526-7(3-7)—this last case cited by appellants.

Assignment No. 6 complains because the trial court found the appellants were the owners of the lot in fee simple as joint tenants, free from any marital interest of Mrs. Ross' husband. In other words it is asserted he still has such an interest, and that specific performance by transfer of the fee title cannot be enforced. The deed was executed on May 10, 1941, for $100 and other valuable considerations, to "Violet Ross and Jeanne McCabe, as joint tenants and to the survivor of them, and not as tenants in common." The habendum clause added, "and to the heirs and assigns of such survivor." The Rosses had been married 15 years at the time of the trial in May, 1947, which dated back to 1932. Mrs. McCabe testified that when she bought the lot in controversy Mr. *and* Mrs. Ross contributed $800 to $1000 to the purchase money. Otherwise, it came from the sale of a cottage she had previously owned. Being asked if Mrs. Ross had helped to buy the cottage, Mrs. McCabe answered, "No sir; not exactly, the cottage was bought, but there was a lot of repairs on it and her husband and her both borrowed on that. Q. And they loaned you some money? A. On the other cottage too."

Mrs. Ross testified the title to the lot was taken in the joint names of herself and her mother because she (Mrs. Ross) had an interest in it which was derived from the fact that she (Mrs. McCabe) owned another house (the cottage) and sold it, and bought the lot in suit. Mrs. Ross said she had an interest in the cottage because she "worked and helped support it" before she was married. She said by that she meant she put her earnings together with her mother's in the cottage, and with the sales proceeds therefrom purchased the lot. Then she corrected her testimony and said she was married long before the first property (the cottage) was *sold* (not bought.) Mr.

Ross testified he and Mrs. Ross "own all our income and property jointly, or assets, by the entirety, whichever way you call it." He said he didn't know how much money Mrs. McCabe put into the property.

Respondents' counsel argues this testimony is too indefinite and uncertain to establish that Mr. Ross contributed to the purchase of the lot in controversy, and that at best it only showed the Rosses loaned money to Mrs. McCabe for repairs thereon. Appellants assert the contrary.

Appellants contend that under the widower's dower statute, Sec. 319, R. S. 1939-Mo. R. S. A., Mr. Ross would have a dower right in the lot, contingent on his wife's surviving Mrs. McCabe, *unless* the money Mrs. Ross furnished to buy it was her separate estate under Sec's. 3385, 3390, R. S. 1939-Mo. R. S. [930] A., in force since 1889. In this instance it undoubtedly was hers. The widower's statute did not repeal the married women's statutes,[2] and she could convey her separate real estate without his joinder in the deed. Under Sec. 3390 her separate personalty and earnings both before and after coverture were hers, and he could not reduce them to his possession without her express consent in writing. If he did use her separate funds without her written consent to create a tenancy by the entireties in the family exchequer, she was not bound by it.[3]

There was no evidence of such consent. And beyond that, at least a part of Mrs. Ross' money was earned before she married him. This assignment is ruled against appellants.

Appellants' Assignment No. 7 is that the salesman Ruengert and Mr. Weiss represented both the buyers and the sellers without appellants' consent, thereby voiding the sales contract. The contention is based on two specifications. The first is that after Herzog had consented to borrow the $3550 from Mr. Van Beers, the Realty Company prepared the deed of trust and notes accordingly. But when Herzog arranged to borrow the money from someone else, the Realty Company followed his wishes and wrote a new set of notes and deed of trust to the substituted lender. As we have said, this arrangement to borrow the money from Mr. Van Beers was verbal and not a part of the sales contract. He was not mentioned in it. The whole provision about borrowing that money was solely for Herzog's benefit. Perhaps if he had been unable to get a loan of that size on the property he would have been protected. But so far as

[2]O'Brien v. Sedalia Trust Co., 319 Mo. 1001, 1008-9(6), 5 S. W. (2d) 74, 76; Scott v. Scott, 324 Mo. 1055, 1060(3-4), 26 S. W. (2d) 598, 600(4); Travelers Ins. Co. v. Beagles, 333 Mo. 568, 572(2), 62 S. W. (2d) 800, 801-2(4).

[3]Johnston v. Johnston, 173 Mo. 91, 118-9(6), 73 S. W. 202, 210(3), 96 A. S. R. 486, 61 L. R. A. 166; Donovan & Boyd v. Griffith, 215 Mo. 149, 167(3), 114 S. W. 621, 626(5), 20 L. R. A. (N. S.) 825, 128 A. S. R. 458, 15 Ann. Cas. 724; Moss v. Ardrey, 260 Mo. 595, 603-8(1), 169 S. W. 6, 8(2).

the appellants are concerned all they could ask for was money. We so held when the case was here before.

The other specification is that the Realty Company assisted Herzog in obtaining the Certificate of Title and accepted $50 therefor. But that was after Mrs. Ross had informed Herzog on September 25 that she and her mother would not perform the sales contract; and after Ruengert had submitted to him the Stipulation and Release on September 27, and tendered his money back; and after he had independently brought this suit on September 29. Herzog did not pay the Realty Company the $50 for the Certificate of Title expense until October 12, and the Certificate was dated October 13. He and his wife waited all the next day at the Realty Company's office for appellants to appear and close the contract, but they came not.

This does not indicate the Realty Company was serving two masters. It is well settled that a real estate broker owes loyalty to his principal, and cannot act for persons adversely interested. But after the broker's agency is terminated he is released. 9 C. J., p. 541, Sec. 40; 12 C. J. S., p. 106, Sec. 43. And so here, when appellants arbitrarily announced they would not perform the very contract they had employed the Realty Company to negotiate, it was not the latter's duty to assist them in that effort. This Assignment 7 is ruled against appellants.

Assignment 9 is that the decree is for the wrong party. It is simply a resumé of the other assignments, and does not call for discussion. The decree of the trial court is affirmed. All concur.