ORVILLE C. MILLER, Respondent, v. CARROLL C. COFFEEN, Appellant,
No. 44063—280 S. W. (2d) 100.

Court en Banc, June 13, 1955.

*Albert Copaken* and *Sylvia Copaken* for appellant.

*Kaer P. Vanice, II, Edwin Earnshaw* and *Kirchner & Vanice* for respondent.

[101] BARRETT, C.—The question presented by this appeal is whether, in the particular circumstances of this record, the trial court appropriately exercised its discretion in decreeing specific performance of a contract to sell real estate, a house and lot in Kansas City.

Before considering the case upon its essential merits, however, it is necessary by way of introduction and approach to briefly note certain general factors concerning which the parties are not in complete agreement. The appellant seller claims, among other things, that the trial court prejudicially erred in the admission of evidence, and particularly in refusing to admit and consider certain proffered evidence. The appellant prepared and requested the court to make sixteen specific findings of fact. The court refused to adopt the appellant's sixteen requests and adopted as its findings of fact the respondent's fourteen specific requests. In addition the court adopted the respondent's offered declarations of law and accordingly entered a judgment decreeing that the appellant specifically perform the contract by conveying his house and lot to the respondent. In connection with these matters the appellant has briefed and argues twenty points, but it is not necessary to a disposition of this appeal to consider

them in detail. Upon this appeal it is the duty of this court to "consider any evidence which was rejected by the trial court and duly preserved for the appeal when the appellate court believes such evidence to be admissible," paying deference "to the opportunity of the trial court to judge of the credibility of the witnesses." V.A.M.S., Sec. 510.310(4). In this connection in this case, this court defers to all findings of fact, which of necessity were solely dependent upon the trial court's persuasion and finding as to the credibility of conflicting oral evidence. Specifically, and contrary to the appellant's claim, there was no substantial evidence of fraud, mutual mistake of fact, or mental incapacity as those terms are generally defined and technically employed in equitable actions. Herzog v. Ross, 358 Mo. 177, 213 S. W. (2) 921; Kirby v. Balke, 306 Mo. 109, 266 S. W. 704; Brown v. Fagan, 71 Mo. 563. On the other hand, the trial court declared as a matter of law that "Owners have a right to sell for what they please, and buyers have a right to pay what they please. The consideration was not grossly inadequate, and the courts will specifically enforce contracts, even though it be a hard one," but the court did not specifically find as a fact "that the price was not grossly inadequate," the fact was declared as a matter of law. In addition to the indicated rules and deference, however, this is, after all, a suit in equity to enforce specific performance of a contract to convey real property and it is the duty of this court to review the record anew and to enter such judgment as, having regard to the applicable, compelling, equitable principles, the trial court should have entered. V.A.M.S., Sec. 510.310(4); Glauert v. Huning, (Mo.) 266 S. W. (2) 653; Herzog v. Ross, supra. One of the distinguishing characteristics of a suit for specific performance is that the trial court's discretion is reviewable anew upon appeal to this court (McClintock, Equity, pp. 129-130), and the essentially meritorious question here is whether in the circumstances the trial court appropriately exercised its discretion and decreed specific performance.

[102] In brief outline the circumstances were that on June 15th, 1951, the appellant, Carroll C. Coffeen, through the agency of a real estate broker, H. H. Flippo, entered into a contract with Floyd R. Finch by which they exchanged properties, an apartment, known as 2607-09 Cherry, owned by Mr. Coffeen and a house, known as 309 South Chelsea, owned by Mr. Finch. In the exchange the apartment was valued at $25,000 and the house on Chelsea at $12,000. In addition, in order that Mr. Finch might finance a loan on the apartment, Mr. Coffeen deposited $6000 in a savings account as collateral security for the loan. Twelve days later, on the 27th day of June, Mr. Coffeen entered into a written contract with the respondent, Orville C. Miller, by which he agreed to convey the property at 309 South Chelsea to Mr. Miller for the sum of $2400, $100 to be paid upon the signing of the contract, $800 to be paid upon delivery of the deed

and "subject to a first Deed of Trust on said property held by the Sentinel Federal Savings & Loan Association of Kansas City, the unpaid balance of said loan being Fifteen Hundred ($1,500.00) Dollars." Mr. Coffeen was to furnish an abstract within ten days showing "good title," and, according to the contract, the taxes and rental were to be prorated between the seller and the buyer. The following day Mr. Coffeen rued his bargain and sought, unsuccessfully, to be released from his contract. Eight days later Mr. Miller instituted this action for specific performance and the trial court, as indicated, has entered a decree compelling Mr. Coffeen to execute a warranty deed conveying the property to Mr. Miller upon the payment of $2400, which sum Mr. Miller actually paid into court after the entry of the decree, September 30th, 1953.

These are the bare facts of the case and it is necessary, at this point, to consider by way of discrimination certain other matters relating to the essence of the remedy of specific performance and particularly to consider in what circumstances the remedy is granted as a matter of right. It is argued by the respondent that if a contract is freely and voluntarily executed, and its terms are clear and specific *"and it is free from objection,"* specific performance will be decreed as a matter of right and not as a matter of grace or favor. In this connection it is urged, in support of the court's declaration of law (not, as indicated, its finding of fact), that every man has a right to deal with his property as he pleases, that the consideration was not grossly inadequate, and, that the court would specifically enforce a contract "even though it be a hard one." Also in this connection it is said that old age, mental weakness, inadequate consideration, or confidential relation, are not in and of themselves independent and substantive grounds upon which a court of equity will relieve a party from a contract voluntarily entered into. Abstractly and in a general way there can be no objection to these assertions. However, a more accurate and complete statement of the general rule is that "specific performance is somewhat of grace as over against a hard and fast matter of absolute right. The chancellor has discretion to perform or not to perform. But he has studied the law of specific performance to little purpose who supposes that discretion may be exercised without reason and of caprice. The discretion to be exercised is a sound (that is) *judicial* discretion. *It is exercised against performance* when plaintiffs come into a court of equity with unclean hands; or when the contract is incomplete or so ambiguous as to be uncertain in terms and intendment; or *where the contract is unfair, overreaching, biting;* or when there are present (in pleadings and proofs) elements of mutual mistake in matter of substance, covinous contrivances, fraud, imposition, surprise or accident, as those terms are understood in the law. *Absent such features and present a fair, plain contract,* one complete and certain in terms and intendments, *specific performance*

*goes as a matter of right.''* Beheret v. Myers, 240 Mo. 58, 77, 144 S. W. 824, 830. See also annotation 65 A.L.R. 7, ''Specific Performance of a Contract as a Matter of Right.'' These rules have been applied and specific performance .appropriately decreed, absent the objectionable [103] features, in many instances but, in addition to Beheret v. Myers, supra, two specific cases will suffice by way of illustration. Kirby v. Balke, 306 Mo. 109, 266 S. W. 704; and Frank A. Gilbert Realty Co. v. Timmerman, (Mo.) 183 S. W. (2) 131.

Furthermore, as the respondent contends, absent the other inequitable incidents, a promise to transfer a specific interest in land is unique (Restatement, Contracts, Sec. 360), and ''*mere* inadequacy— that is, inequality in value between the subject-matter and the price— is not a ground for refusing the remedy of specific performance; in order to be a defense, the inadequacy must either be accompanied by other inequitable incidents, or must be so gross as to show fraud.'' 3 Pomeroy, Equity Jurisprudence, Sec. 926, p. 631; 2 Restatement, Contracts, comment pp. 665-666. Nevertheless, one of the equitable incidents for consideration in withholding or decreeing specific performance of a contract is the fairness and reasonableness of the consideration in view of all the circumstances. Annotation 65 A.L.R., l.c. 85; Restatement, Contracts, Sec. 367. In this connection, despite the statement that ''inadequacy as a negative defense, and as. an affirmative ground for a cancellation, is governed by one and the same rule'' (3, Pomeroy, Equity Jurisprudence, p. 631), there is a difference in the suits to cancel deeds, relied upon by the respondent, and in the suits for the specific performance of contracts. Binnion v. Clark, 359 Mo. 202, 221 S. W. (2) 214. Likewise, the suits for specific performance of contracts in consideration of support, of which Campbell v. McLaughlin, (Mo.) 205 S. W. 18, is an example, stand alone. In all the cases relied upon by the respondent where inadequacy of consideration was a factor and specific performance was decreed there were additional compelling factors. There had been part performance of the contract (Strachan v. Drake, 61 Colo. 444, 158 Pac. 310), the rights of third parties had intervened or there had been a change of position (Scott v. Habinck, 188 Ia. 155, 174 N. W. 1), or, the contract arose out of a divorce, alimony and support judgment (Greenwood v. Greenwood, 96 Kans. 591, 152 Pac. 657; 97 Kans. 380, 155 Pac. 807), or, the contract was in consideration of support (Woodworth v. Porter, 224 Mich. 470, 194 N. W. 1015), or there was in fact no inadequacy of consideration (Harrison v. Town, 17 Mo. 237) or, the inadequacy of consideration was not too disproportionate, $2500 in an exchange of properties, as in Kirby v. Balke, supra.

In this case 309 South Chelsea consists of a whole lot worth $1200, a five-room frame bungalow with a full basement and a screened-in front porch in a well-kept residential neighborhood. One witness said that the house could not be replaced for less than twelve to thirteen

thousand dollars. There is a living room with a fireplace, two bedrooms, a bath, a dining room and an enclosed breakfast nook. There was a new gas furnace in the house and in the back yard there was a paved space for a patio. The plaintiff produced one witness who gave it as his opinion that the present value of the property was $7000 and that its value in 1951 was $5250 to $5500. This man was of the opinion that a sale price of $12,000 was too high, but he was also of the opinion that a sale for $2400 in 1951 "was a little cheap," he said, "a little too cheap." According to the adopted findings of fact Mr. Coffeen "has collected rent on the premises aforesaid at the rate of $85.00 per month since July 1, 1951." The trial court made no specific finding as to the value of the property, but without question it was worth eleven to twelve thousand dollars in June 1951, and by any standard the sole consideration of twenty-four hundred dollars was indeed shockingly inadequate, if not so flagrantly inadequate as to compel a denial of specific performance (Restatement, Contracts, Sec. 367), it was certainly so conspicuously inadequate as to make the contract and its enforcement oppressive, unfair and biting. Beheret v. Myers, supra.

Not only was the consideration shockingly inadequate but Mr. Miller was well aware of the fact and of the property's true value, (Frederich v. Union Electric L. & P. Co., 336 Mo. 1038, 82 S. W. (2) 79), and that knowledge came to him long [104] before Mr. Coffeen acquired the property, even though, as the findings of fact state, he was inexperienced and never owned a piece of property in his life. He and Mrs. Miller had some friends, Mr. and Mrs. Hirsch, who lived two doors north at 305 South Chelsea, and they were frequent visitors in their home. Mr. Miller was in the house in 1950 or 1951 when Mr. Finch owned it, "just walked through it." The reason for his visit on this occasion was that Mr. Finch had told Mr. or Mrs. Hirsch that "he might rent the place," but Mr. Finch "didn't say definitely that he was going to rent it." Mr. Miller and Mr. Finch belonged to the same lodge and he claimed that his other conversations with Mr. Finch concerned their lodge work and he denied that Mr. Finch offered to sell him the property for $12,000 and that he made a counteroffer of $10,-000. He was through the house on another occasion when some friends of Mr. Finch were living there, "Mr. Finch at that time thought he might rent the place instead of selling the place. * * * I told the people if Mr. Finch decided to rent the place I would like to have the first opportunity." Previously some lady connected with a real estate firm had talked to Mr. Miller about buying the place, he thought she asked $10,500 for it, but "when she named the price I said it was too far above me, that was the end of it."

The trial court found that Mr. Coffeen had trafficked extensively in real estate, and while respondent's counsel would draw the inference that Mr. Coffeen was a shrewd, experienced "speculator" in

real estate and that Mr. Miller was an innocent, inexperienced novice, the fact is that in general these two men stand on about an equal footing, except for Mr. Miller's obviously superior natural acuteness. Mr. Miller's education did not extend beyond the sixth grade, but he is evidently in the prime of life and holds the very responsible position of "locomotive machinist inspector" with the Missouri Pacific Railroad. Mr. Coffeen had gone through "grammar school" and had attended night school for a few months in Omaha. He was seventy years of age when the contract was executed. He had been a cable splicer for a telephone company and for fourteen years prior to 1948 had operated an automobile generator repair shop in Kansas City. In the meantime Mr. Coffeen had engaged in several real estate transactions, but upon analysis the transactions were neither so shrewd nor successful as to betoken superior bargaining capacity with Mr. Miller, even had they been left to their own devices. But, as indicated in these respects we defer to the trial court's findings and consider the events surrounding the execution of the contract and Mr. Miller's further knowledge of the value of the property.

By the 25th of June a real estate broker had given Mr. Coffeen a card with Mr. Miller's name on it as a person interested in the 309 South Chelsea property. On that day he called on the telephone and, according to Mr. Miller, "wanted to know if I would be interested in renting this property at $100.00. I said no, sir. He wanted to know if I would be interested in buying the house. I said, 'That all depends.' 'Well,' he said, 'Do you think you could dig down in your sock and dig up a couple of thousand dollars?' 'Well,' I said, 'I don't know about that.' " Mr. Miller says that he did not know the man and told him "if he wanted to talk to me to come down to my home," and they made an appointment for ten o'clock on June 27th. At the appointed hour Mr. Coffeen appeared at Mr. Miller's home and, after some preliminary discussion, Mr. Miller says that Mr. Coffeen said, "Would you pay me $1500.00 due the Sentinel Loan Company on that property and give me $600.00 cash?" Mrs. Miller, in testifying as the first witness, volunteered the information that when Mr. Coffeen made the offer of $2100 her husband said, "Did I understand you right?" Mr. Miller said that by reason of his working around Diesel locomotives "sometimes there is a little roaring when you first get up of a morning," and, he said, "Let me understand you right." Mr. Coffeen [105] repeated his offer of $2100 and Mr. Miller "asked him if he had the papers on this property." Mr. Coffeen informed him that he had the papers at his residence and they immediately drove to his home and Mr. Miller examined the papers. He said, of the papers, "It didn't mean anything to me because I didn't know what the score was," but the papers consisted, among other things, of the "closing statement" showing in detail the values used in the exchange of properties between Mr. Finch and Mr. Coffeen. The statement contains this item, "By credit, trans-

fer of 309 So. Chelsea $10,500'' which figure plus the $1500 due the loan company totaled $12,000. It was at this juncture that Mr. Coffeen called someone on the telephone, Mr. Flippo, and reported to Mr. Miller that Mr. Flippo had to have a commission of $300 and Mr. Coffeen then raised the price to $900 and the payment of the $1500 loan. According to Mr. Miller, Mr. Coffeen's desire to sell his property for $2400, twelve days after its acquisition, was based upon two factors, he was interested in another piece of property for which he needed ready cash and he was anxious to avoid the payment of further commissions to real estate agents.

In addition to the reasonable inferences from Mr. Miller's own testimony as to his knowledge of the property and its value, these parties were not left to their own devices and did not negotiate and consummate their contract alone and on equal terms. Kirby v. Balke, 306 Mo., l.c. 121, 266 S. W., l.c. 708. After Mr. Coffeen raised the price to $2400 Mr. Miller said, ''If that is your price we will take the papers and we will see an attorney.'' Mr. Coffeen suggested his own attorney, Mr. Aughinbaugh, but they went to Mr. Miller's lawyer and the lawyer, without advising or counseling Mr. Coffeen, examined the papers and prepared the contract which the parties immediately executed. Mr. Miller wrote a check to Mr. Coffeen for $100 but the check was left with Mr. Miller's lawyer. As we have said, the day after the execution of the contract Mr. Coffeen sickened of his bargain and consulted his lawyer and in a day or two the lawyers and their clients met and it was unsuccessfully sought to extricate Mr. Coffeen from his difficulties by way of a settlement. Of this conference and attempted settlement, Mr. Aughinbaugh, for whom all the parties profess great respect, said, ''I went to (counsel's) office with the contract and told him Mr. Coffeen had talked to me about it and had said that he was in bad shape about this contract and that he didn't understand the transaction, he thought he was to get more than $2400.00. * * * I talked to him, told him this man did not want to go through with the contract, that he felt like there was a misunderstanding about the price. I discussed it freely with him and told him the man would be willing to pay something to get out of the contract if he caused anybody any hardships about it. When we got down to amounts I suggested that he might pay a few hundred dollars. He said there was more than a few hundred dollars, *there was several thousand dollars profit in it,* he was not about to recommend its cancellation, he was specifically going to force it.'' Subsequently, (subject to the trial court's ruling upon objection that ''I can take it into consideration and strike it out in an equity case, if I want to'') Mr. Aughinbaugh said, ''As a lawyer I don't like to give the sum and substance of what was said. I do remember one thing very distinctly that one of the reasons I wanted not to have anything to do with it, I told (counsel)

and told them there I thought this man didn't know what he was doing, he ought to be adjudicated if I had anything to do with it.''

But whatever conflicting or different inferences might be drawn from the evidence, the record demonstrates beyond dispute shockingly inadequate consideration, and a conspicuously harsh, biting, and oppressive contract. Beheret v. Myers, supra; Kilpatrick v. Wiley, 197 Mo. 123, 95 S. W. 213; 49 Am. Jur., Sec. 51, p. 66. In addition to these inequitable inferences and incidents, certain other compelling factors [106] inhere in the contract and transaction and plainly demonstrate the inequity of a decree of specific performance in the particular circumstances of this case. Hargis v. Smith, (Mo.) 178 S. W. 72, 75; Ranck v. Wickwire, 255 Mo. 42, 61, 164 S. W. 460, 466; 49 Am. Jur., Sec. 58, p. 72. While this is not to deprive one of a profitable bargain (Basye v. Jamison, 124 Mo. 551, 27 S. W. 560; 49 Am. Jur., Secs. 59-60), even a ''hard one'' improvidently entered into by the seller, the sole loss or injury resulting to Mr. Miller from a withholding of the discretionary decree of specific performance is the loss of ,a profitable bargain and the ''right to make a clean and substantial profit'' from the property of his adversary. Annotation 65 A.L.R., l.c. 9. And in this connection it is notable that there are no intervening rights of innocent third parties and there has been no unfavorable change of position in either Mr. Miller's affairs or his finances (Frederich v. Union Electric L. & P. Co., 336 Mo., l.c. 1051, 82 S. W. (2), l.c. 85) and there has been no possible loss to him that could not have been recovered in an action for damages for breach of the contract. Eisenbeis v. Shillington, 349 Mo. 108, 159 S. W. (2) 641; Houtz v. Hellman, 228 Mo. 655, 671, 128 S. W. 1001, 1006; annotation 65 A.L.R., l.c. 37. In the circumstances of this transaction the plaintiff's remedy at law for damages was particularly adequate for his protection in every respect. Gottfried v. Bray, 208 Mo. 652, 106 S. W. 639. In short, in view of the shocking inadequacy of the consideration and the presence of the noted inequitable factors, enforcement of the contract would impose an unreasonable, disproportionate hardship upon the defendant, Coffeen, and, in all the circumstances, the justice of the decree of specific performance is not made to appear. Restatement, Contracts, Sec. 367; Rockhill Tennis Club v. Volker, 331 Mo. 947, 969, 56 S. W. (2) 9, 18-19; annotation 65 A.L.R., l.c. 64, 85. Accordingly the judgment and decree is reversed and the cause remanded with directions to dismiss the plaintiff's action.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court en Banc. All concur.