COMMUNITY LAND CORPORATION, a Missouri Corporation, Respondent,

v.

William STUENKEL and Marie Stuenkel, Appellants.

No. 53266.

Supreme Court of Missouri, Division No. 2.

Dec. 31, 1968.

William T. Bellamy, Jr., Bellamy & Bellamy, Marshall, for plaintiff-respondent.

Ike Skelton, Jr., Lexington, for appellants; Bradley, Skelton & Schelp, Lexington, of counsel.

DONNELLY, Judge.

This is a suit for specific performance. Plaintiff is a not-for-profit corporation, incorporated October 26, 1966. Defendants are owners of a 28-acre tract in Lafayette County, Missouri. On the morning of May 21, 1966, before the corporation was incorporated, three members of its board of directors, Melvin J. Frerking, Earl Brockman, and Wendell Olson, went to see defendants for the purpose of purchasing land for the development of a residential area for homes for senior citizens. The northeast portion of defendants' tract was discussed. Later the same day, Frerking and William Vinnedge, another member of the group, returned to defendants' home, a discussion ensued, and the following document was prepared by William Stuenkel and signed by William Stuenkel and Marie Stuenkel:

"Received of Melvin J. Frerking Treasurer of the Community Land Corp. $100.00 down payt. on the following described property. This property can be described before an actual survey is made as follows— Starting in North East corner lot number 15, 14, 13, 12, 11, 10 and part of nine, approximatly 92 ft. then south across the 40 ft. street into east bay lot number 1, 2, 3, 4, 5, 6, 7 then east across the street to the south lot line of lot 3. and then go north to the survey line and follow this line all the way to the point of beginning. In these boundary would be 5 acres more or less. No construction shall start untill the full amount is paid which is at the rate of $2000.00 per acre for as many acres as the actual survey shows. All parties agree that streets as laid out on plat shall remain."

The plat referred to is of an undeveloped 28-acre tract. It was prepared for defendants in 1959. It shows proposed residential lots and streets. Its north boundary line adjoins the south right-of-way line of Interstate 70 to which there is no access. Its south boundary line adjoins old U.S. 40, which is now maintained by the Concordia Special Road District, and which affords the only means of access to the tract. The tract claimed by plaintiff, containing 6.34 acres, lies in the northeast corner of the plat. Its south boundary line lies 290 feet north of old U.S. 40. The plat shows a street, thirty feet wide, extending north and south, from old U.S. 40 to the south boundary line of the 6.34-acre tract claimed by plaintiff. The plat also shows a street, with a circular drive, extending through the 6.34-acre tract claimed by plaintiff, together with other streets placed generally over the 28-acre platted area.

On September 9, 1966, defendants were asked to sign a deed to the property claimed by plaintiff, which deed included the street extending from the south boundary line of the 6.34-acre tract to old U.S. 40. Defendants refused to sign the deed.

Plaintiff brought suit for specific performance. Trial was had before the court without a jury. The trial court ordered payment by plaintiff of the sum of $12,580, established title in plaintiff to the 6.34-acre tract, vested in plaintiff a right of ingress and egress over the street, thirty feet wide, described on the plat, and decreed that all streets as laid out on the plat shall remain as laid out on the plat, with certain exceptions not material here. Defendants appeal.

Appellants first contend "the trial court erred in granting plaintiff an easement for

ingress and egress because such was not included as part of the alleged agreement." The agreement contained the words, *"All parties agree that streets as laid out on plat shall remain."* We must determine the legal effect of these words.

*Defendant William Stuenkel testified as follows:*

"Q Any other conversation take place at that first meeting on the 21st day of May, 1966? A Any other conversation?

Q Yes. A No, sir.

Q Well, was there a second meeting between you and any other persons? A Yes, sir, within an hour Melvin Frerking and Mr. Vinnedge came back.

Q That morning? A That same morning within an hour, because I looked at my watch, or clock.

Q What transpired at that second meeting? A Well, those two came down and Mr. Vinnedge, he just stood there; he stood there like that (indicating), and my wife asked him to please sit down; he didn't speak; he wouldn't say anything; he wouldn't sit down; he stood there like a statue.

Q Then, what happened? A Well, then, Mr. Frerking said, 'we would like to make a down payment on this land.' 'Oh,' I said, 'I don't think that is necessary; my word is good.' 'But we want a down payment.' 'All right—' well, I said, 'all right.' He got out two fifty dollar bills and laid them down there and he said, 'now, we would like to have a receipt.' I said, 'why don't you just give me a check?' But no, he—Mr. Vinnedge, I sold him some acreage last year and he wouldn't give me a check; Mr. Bellamy had to give me a check; I had to go to Marshall to get it. So I said, 'that isn't necessary.' 'We want a receipt.' 'All right.' I started writing a receipt, and I believe you have had it here, and then I got to the point, I said, 'now, remember, Mr. Frerking, we talked about this

a moment ago, that I want this circular drive open,' and I told both of them right there and then; I said, 'now, I want it that way.' I said, 'all you have to do is say no and we'll be as good a friends as before,' and they said, 'all right.' Then, I got to this circular drive, and I noticed that it had rounded corners, so I said, 'now, I don't know how to describe that; you know that I want to keep that drive open,' and I said, 'my Attorney can, I guess, put that in there in the proper way,' so I said, 'all right; I want to be sure that stays open.' So I thought a while and I finally came up with this answer I wrote down: that all roads, I believe, remain open as now, or as they now are.

Q On that receipt, that piece of paper? A Yes, sir, that is right; that means the roads in here that I was referring to.

Q Referring to your circular drive? A That is right."

*Melvin J. Frerking testified as follows:*

"Q * * *

Mr. Stuenkel was concerned about this circular driveway, was he not, that was in the land that you all were wanting? A The morning we were there, on May the 21st, he expressed that he was very fond of the way the plot was laid out and he was very proud of it, yes.

Q And that is what he wanted to keep open, isn't that right? A Yes.

Q And this area right here (indicating), I'm referring to the circular driveway on the eastern part of this Plat, is what he was concerned with keeping open, was he not? A That is right.

Q And after he talked about— A Not only that, all of it.

Q Was he mainly concerned with this circular driveway? A He was proud of the whole—

Q I understand; I'm not asking whether he was proud; what he talked about,

what I pointed out to you, was he not concerned and did he not point out the fact that he wanted this circular driveway kept open? A I don't know whether that particular one was mentioned; he said he wanted the roads to remain.

Q Are you telling the Judge, then, that he did not refer to this circular driveway? A That specific circular drive, I'm saying that it wasn't referred to; it was referred to as a whole Plat, that he was very proud of it, and that particular circular portion of it there wasn't; he may have meant this one here (indicating), I don't know.

Q Didn't you tell this Judge some time ago, this morning, that he wanted this driveway left open? A He wanted all of the streets to remain.

Q Your testimony is now that you don't remember him saying anything about this circular driveway? A Not just this portion of it, no; I'm saying as a whole, he wanted the roads to remain as shown on the Plat."

*Earl Brockman testified as follows:*

"Q Now, was there any discussion about roads? A Mr. Stuenkel said he would like to keep the roads as they were, and we agreed to that.

Q Was there any discussion about how wide the roads should be? A Yes, sir, the streets he had there on that map was 30 feet, and according to the incident we had in Concordia, that the City had with Mr. Uphaus, I told him the City would not accept them unless they were 40-feet streets, so he said to take 5 foot off of each side of the lot to make it a 40-foot street.

Q Mr. Stuenkel said that? A Yes.

Q Now, you said that all streets were to remain on the Plat as they were. Was there any discussion about any other streets that might not remain exactly as they were?

"MR. SKELTON: I believe he has answered that already.

"Q BY MR. BELLAMY: In other words, all the streets on the Plat were to remain as they were? A Yes, sir."

*Wendell Olson testified as follows:*

"Q Was there any discussion about roadways? A Well, Mr. Stuenkel was, like I said, opposed to selling that ground because of a circular drive, and I gave Mr. Stuenkel my word, as long as I was in the Corporation, that I would see to it that the circular drive would stay in there on his Plat, with the exception of that one dead-end road that is going back towards the northeast corner, the road that could be closed up, or filled up, however the Corporation wanted to do it, because it was of no value where it dead-ended in the corner.

Q Was there any discussion about how wide the streets would have to be? A Mr. Brockman talked about it to Mr. Stuenkel, because if the City maintained them—I didn't discuss it with Mr. Stuenkel, but I know Earl Brockman discussed it with him.

Q How wide did they say the streets would have to be? A I believe on there, 30 feet; if I remember right, said for the City to maintain them they would have to be at least 40-foot wide.

Q You do remember Mr. Stuenkel wanted all of the other streets on the Plat to stay where they were? A Yes, sir, I assumed that the rest, west end and south end, would stay like they were."

■ We first recognize the general rule "that a court of equity will not make a contract for the parties, and if a contract is indefinite, uncertain or incomplete the court will not order specific performance." Wilkinson v. Vaughn, Mo.Sup., 419 S.W.2d 1, 5; Pomeroy, Specific Performance of Contracts, 3rd Ed., § 159. However, parol evidence "may always be resorted to for the purpose of explaining the position of the

parties and of the subject-matter and other surrounding circumstances at the time of concluding the contract, so that the court may be put into the position of the parties, may see with their eyes, and may understand the force and application of the language employed by them." Pomeroy, Specific Performance of Contracts, 3rd Ed., § 161, pp. 412–413; Herzog v. Ross, 355 Mo. 406, 196 S.W.2d 268, 167 A.L.R. 407.

■ In reviewing the evidence on appeal, we pay deference "to the opportunity of the trial court to judge of the credibility of the witnesses." Section 510.310(4), RSMo 1959, V.A.M.S.; S.Ct. Rule 73.01, V.A.M.R. However, it is our duty to "review the record anew and to enter such judgment as, having regard to the applicable, compelling equitable principles, the trial court should have entered." Miller v. Coffeen, 365 Mo. 204, 208, 280 S.W.2d 100, 101.

■ We have reviewed the evidence and, deferring to the trial court on credibility of the witnesses, are of the opinion that defendants are bound by the language used by William Stuenkel in the written contract. Defendants agreed that "streets as laid out on plat shall remain." He did not limit the agreement to streets "on the land to be sold" as he claims was his intent. His primary concern was the street on which the circular drive was located. However, he did not limit the agreement to such street. We must give consideration to what the contract "actually says and not what * * * [William Stuenkel] intended secretly or without stating or what he might have said if he had decided to further explain his intention." Kerrick v. Schoenberg, Mo.Sup., 328 S.W.2d 595, 599. The trial court did not err in ruling that an easement for ingress and egress was included as part of the contract.

Defendants next contend that "the signing of the receipt does not constitute a binding contract because the parties were looking forward to an attorney drawing a contract between the parties sometime in the future."

*Defendant William Stuenkel testified as follows:*

"Q Let me ask you: Was there any conversation about your Lawyer drawing a contract up? A Yes, sir.

Q Tell the Judge what happened, then.

A All right. While we were discussing that—

Q Was that at the first or second meeting? A It was at the first meeting, before Mr. Vinnedge and Mr. Frerking came back.

Q All right. A. After everything was in order, everybody seemed to be happy, and then we agreed that a contract had to be drawn, and I said this: I said, 'let me make a suggestion; why don't we do this,' I said, 'why don't we, I and one of you, or all three of you, go to my Attorney and have him draw up the contract, then, we'll take the contract to you and you can take it to your Attorney and have him look it over, and if you find anything wrong with it, then, he has it changed, and go back to my Attorney—' and I told them this, especially, I said, 'I did that one time, where both parties went to the same Attorney,' and when I told them that I wanted to lay my cards on the table, and I said, 'we had a nice contract drawn and had no trouble whatsoever afterwards,' and they agreed and said, 'that is a good idea; we'll do that.'

Q All right. Did you tell Mr. Frerking? A Yes, he was there."

*Witness Lloyd Beissenherz, publisher of the newspaper in Concordia, Missouri, testified as follows:*

Q Would you tell, us, sir, what Mr. Vinnedge told you if anything, concerning an agreement or contract for the purpose of real estate? A So far as I can recall, he told me just the words that I used here, especially in this last part of the first paragraph.

Q Read those words to us, sir. A 'He said a contract to buy is being prepared

and arrangements have been made for a survey of the site to determine the exact area.'

Q Did he say that a contract had been prepared? A To the best of my recollection he said it was being arranged—arrangements were being made, because they still had to complete a survey to get the exact area to be included in the contract."

*Melvin J. Frerking testified as follows:*

"Q And when you went out there the first time, did Mr. Stuenkel not say that he wanted his Attorney to draw up a contract and that you folks should look it over? A Not to my knowledge.

Q That your Attorney should look it over? A No, not to my knowledge.

Q It could have been said, could it not? A It could have been, but I wouldn't put it that way.

Q Are you telling us under oath that it was not said? A That is right."

*William Vinnedge testified as follows:*

"Q Now, Mr. Vinnedge, when you were out there talking to the Stuenkels, isn't it a fact that Mr. and Mrs. Stuenkel said that they were going to talk to their Attorney and one of you should go with them and a contract should be drawn up to sell this land, and then your Attorney should approve it? A No, sir.

Q That was not said? A No, sir, not to my knowledge.

Q Are you telling this Judge that at all times you considered this a contract from the time Mr. Stuenkel wrote it? A Yes, sir, sure.

Q I'll ask you if you did not give some information to Mr. Lloyd Beissenherz of the Concordian, and tell him that a contract to buy is being prepared? In other words, the contract was not yet signed and would be signed in the future; did you tell him that? A No, sir."

The trial court resolved this fact issue in plaintiff's favor and we defer to the trial court in this regard. Section 510.310(4), RSMo 1959, V.A.M.S.; S.Ct. Rule 73.01, V.A.M.R.

Appellants next contend that "the trial court erred in ordering specific performance when the alleged contract was signed by defendants alone and hence lacked mutuality and was thus unenforceable."

In Ray v. Wooster, Mo.Sup., 270 S.W.2d 743, at 752, this Court said:

"It is next urged that since plaintiff did not sign the memorandum the contract could not be enforced against him, hence there was lacking a mutuality of remedy. There is no merit to this contention.

"The filing of a suit on a contract by the party not signing against the other party who did sign supplies the requirement of mutuality of remedy. * * *"

Appellants next contend "the trial court erred in granting an ingress-egress easement because plaintiff fails to allege in its petition that such easement is a way of necessity, and the decreeing of such easement deprived defendants of property rights in violation of the Missouri Constitution, and, further, plaintiff has its remedy at law under state constitutional provisions."

Art. I, § 28, Const. of Mo., 1945, V.A.M.S., provides as follows:

"Section 28. That private property shall not be taken for private use with or without compensation, unless by consent of the owner, except for private ways of necessity, and except for drains and ditches across the lands of others for agricultural and sanitary purposes, in

the manner prescribed by law; and that when an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public." See § 228.340, RSMo 1959, V.A.M.S.

Art. I, § 28, supra, does not prohibit the taking of private property "by consent of the owner." We have held that the easement for ingress and egress was included as part of the contract. Appellants' contention is without merit.

Appellants next contend "the trial court erred by decreeing specific performance because there was no valid assignment, in writing, of the rights of Melvin J. Frerking, to the plaintiff corporation."

The parties apparently agree that the original contract was between Melvin J. Frerking and defendants because plaintiff corporation was not in existence when the contract was executed on May 21, 1966. It is also conceded that the assignment from Frerking to plaintiff was not written. Defendants rely upon § 432.010 RSMo 1959, V.A.M.S., the Statute of Frauds. The question presented is whether defendants may question the validity of the assignment in this case.

" * * * Contracts within the statutes of frauds are not void, but only voidable at the election of the party to be charged. * * *" St. Louis, Keokuk & N. W. Ry. Co. v. Clark, 121 Mo. 169, 176, 25 S.W. 192, 196. The provisions of § 432.010, supra, could properly be raised in a dispute between Frerking and plaintiff over the validity of the assignment. However, its benefits cannot be claimed by defendants, who were not parties to the assignment.

We hold that defendants may not, on the basis of the Statute of Frauds, question the validity of the assignment from Frerking to plaintiff. Cf. B. Roth

Tool Co. v. Champ Spring Co., 93 Mo.App. 530, 67 S.W. 967. The trial court did not err in this regard.

Appellants finally contend that the trial court erred "in improperly assessing the costs of this action against defendants because defendants were willing to convey the real estate, except for the easement, and for the further reason that defendants were not required by the trial court to convey the 40-foot easement as prayed for by plaintiff, but merely a 30-foot easement."

In Amitin v. Izard, Mo.App., 262 S.W.2d 353, at 356, appears a statement particularly appropriate here:

"Finally, the defendants assert that the chancellor erred in assessing all of the costs incurred in the circuit court against them. Ordinarily the party prevailing in a case shall recover his costs against the other party. Section 514.060 RSMo 1949, V.A.M.S. In equity cases, however, courts have an inherent, discretionary power to award costs. Either party may be ordered to pay the costs or they may be apportioned among the parties. The determination of this question by the trial court will not be disturbed by an appellate court unless there is an abuse of discretion. * * *"

We recognize that defendants, in their answer, tendered a deed conveying to plaintiff the 6.34-acre tract, and that the trial court granted plaintiff an easement, 30 feet wide, rather than the easement, 40 feet wide, asked by plaintiff. However, the principal issue litigated in the trial court involved plaintiff's right to an easement. The plat referred to an easement, thirty feet wide, and the trial court properly restricted the easement to such width. We cannot say that the trial court abused its discretion in assessing costs against defendants.

The judgment is affirmed.

All of the Judges concur.